1      UNITED STATES DISTRICT COURT

2    FOR THE WESTERN DISTRICT OF NORTH CAROLINA

3            CHARLOTTE DIVISION

F I L E D
CHARLOTTE, N.C.

AUG 2 9 1996

U.S. DISTRICT COURT
W. DIST. OF N.C.

4

5

6   UNITED STATES OF AMERICA   )   DOCKET NO. 3:95-CR-31-2
                               )
7          vs.                 )
                               )
8   ERIC CREIGHTON SAMPSON,    )
                               )
9         Defendant.           )
    _____)
10  UNITED STATES OF AMERICA   )   DOCKET NO. 3:95-CR-31-3
                               )
11         vs.                 )
                               )
12  CEDRIC LAMONT DEAN,        )
                               )
13        Defendant.           )
    _____)

14

15

16         Transcript of proceedings before the

17  Honorable WILLIAM L. OSTEEN, SR., United States District

18  Court Judge, before Scott A. Huseby, Official Court

19  Reporter and Notary Public, at the Charles R. Jonas

20  Federal Building, Charlotte, North Carolina on the 20th

21  day of May, 1996.

22

23

24

25

1    APPEARANCES:

2      On Behalf of the United States:

3      GRETCHEN C.F. SHAPPERT
       Assistant United States Attorney
4      227 West Trade Street, Suite 1700
       Charlotte, North Carolina  28204
5

6      On Behalf of Defendant Sampson:

7      KENNETH P. ANDRESEN, Esq.
       Post Office Box 12137
8      Charlotte, North Carolina  28220-2137

9
       On Behalf of Defendant Dean:
10
       CLAIRE J. RAUSHER, Attorney at Law
11     Post Office Box 472187
       Charlotte, North Carolina  28247
12

13                          ---

14

15          THE COURT:  Ms. Rausher, I have your objections

16     submitted.  Do you have a copy, did you give a copy of

17     your latest, your revised version of the sentencing

18     memorandum to Ms. Shappert.

19          MS. RAUSHER:  Yes, Your Honor, I hand delivered

20     it to their office on Friday.

21          THE COURT:  And, Ms. Shappert, did you give a

22     copy of your calculations to each of the attorneys?

23          MS. SHAPPERT:  Your Honor, I did this morning.

24     And I believe both of them have already received copies

25     of the transcripts, so they also like a government have

1    copies of the trial transcript.

2         THE COURT:  All right.  Remember that I do not

3    have copies of the transcript, I have only my notes that

4    I have been over as we go through the matters.

5         Ms. Rausher, on your objection to Paragraph 8

6    where there is a discussion of -- I believe Paragraph 8

7    was the discussion of the ramifications of the entire

8    conspiracy.

9         MS. RAUSHER:  Actually, Your Honor, Paragraph 8

10   was the list of the codefendants and what their

11   sentences were.

12        THE COURT:  Yes.  And that was -- at that time,

13   they were not aware of the sentencing of any of these

14   people, but some of them have been sentenced since that

15   time.

16        MS. RAUSHER:  In fact, Your Honor, except for

17   Mr. Sampson and Mr. Dean, they have all been sentenced.

18   And Friday afternoon, I went to the Courthouse and I got

19   the sentences for the other two defendants, which I

20   would also like to become part of the record.

21        THE COURT:  You may do so.

22        MS. RAUSHER:  Your Honor, James Sweat received a

23   sentence on Count One of 115 months, and that I got from

24   the judgment and commitment order in this case which was

25   in the court file.  According to the court file, Eddie

```
 1     Little was also sentenced.  The judgment and commitment
 2     order was not in the file, but the notes from the court
 3     clerk were in the file, and according to that,
 4     Mr. Little received a sentence of 84 months on Count
 5     One, and then there was an additional 924(c) count where
 6     he received a five-year consecutive sentence.
 7          THE COURT:  Thank you very much.  Do you disagree
 8     with that, Ms. Shappert?
 9          MS. SHAPPERT:  Your Honor, I do not.
10          THE COURT:  The second item was the Paragraph 9
11     where there is an objection to the group calculation.
12     Ms. Rausher, the calculation set forth in Paragraph 9
13     has no bearing on the calculation of what your client
14     specifically is to be attributed in this case.  Do you
15     see that Paragraph 9 does anything to harm or help your
16     client?
17          MS. RAUSHER:  Well, Your Honor, it's unclear from
18     the -- essentially that paragraph states that a
19     conspiracy involved an amount in excess of 19 kilograms
20     of cocaine base.  As Your Honor will recall from the
21     trial testimony, Mr. Dean -- and the time of the
22     conspiracy was from '92 through '95.  As you recall from
23     the trial testimony, Mr. Dean was incarcerated until
24     June of 1994, a significant portion of that conspiracy,
25     and I just want it clear for the record because
```

1   he -- excuse me, February of '94, and there is actually

2   a stipulation, and in my memorandum, I set out actually

3   the dates from the stipulation as to when he was

4   incarcerated. And so I want to make it clear that

5   that's not the total amount -- that's what the

6   government is alleging the full conspiracy but not --

7   THE COURT: That's the way I interpret it, that's

8   the whole conspiracy not that which your client

9   personally is responsible for distributing, selling or

10  whatever.

11  MS. RAUSHER: Well, I would submit to the Court

12  that the way it's presently ordered worded is

13  misleading.

14  THE COURT: The group was responsible for the

15  distribution. What do you want to change?

16  MS. RAUSHER: Well, Your Honor, I would just like

17  that paragraph to add that Mr. Dean was incarcerated

18  until February of 1995.

19  THE COURT: Well --

20  THE DEFENDANT: 4.

21  MS. RAUSHER: 4, '94.

22  THE COURT: I think the presentence report itself

23  shows that the calculations that are made even by the

24  government and by the probation office do not attempt to

25  make your client responsible for the full 19 kilograms.

1    And for that reason, I don't see why your client is

2    harmed by a paragraph which sets forth the overall

3    conspiracy activity.  We are not holding him

4    responsible, at least I'm not, for calculations of drugs

5    that there is no evidence that he was there on or

6    participated in.  He will be held responsible only for

7    that which is supported by credible evidence.

8            MS. RAUSHER:  And I understand that, Your Honor.

9    However, as you know, this report is something that

10   stays with Mr. Dean while he is incarcerated and any

11   allegations that are contained in the report.  And this

12   is literally the first paragraph in the report, and I

13   just think that it's unclear in that section as to what,

14   in fact, is attributable to him.  When you read that

15   paragraph, it talks about the conspiracy being involved

16   in 19 kilograms, and I just think it's extraordinarily

17   misleading for Mr. Dean.

18           THE COURT:  Well, you want in the first paragraph

19   that Mr. Dean was incarcerated during a period of time

20   of the conspiracy?

21           MS. RAUSHER:  That's correct.

22           THE COURT:  So you want to add to it that

23   Mr. Dean was incarcerated during a substantial part of

24   the conspiracy time?

25           MS. RAUSHER:  That would be fine, Your Honor.

1      THE COURT:  Any objection to that, Ms. Shappert?

2      MS. SHAPPERT:  No, sir.

3      THE COURT:  All right, that will be amended to do

4  that for the presentence report which goes to the

5  institution with him.

6      Paragraph 10, we have no knowledge of the

7  accuracy of Paragraphs 10 and 11, but that does not

8  affect your client, 10 and 11, is that correct?

9      MS. RAUSHER:  10 and 11, both paragraphs don't

10 involve conduct involving Mr. Dean.

11     THE COURT:  Right.

12     MS. RAUSHER:  Therefore, I'd submit to the Court

13 they are not relevant to be in the report.

14     THE COURT:  Well, I think it's relevant from the

15 standpoint of the overall conspiracy that has been

16 involved and mentioned in Paragraph 9.  So I would not

17 take them out, but I would certainly note that your

18 client is not to be held responsible in calculation for

19 the offense level for Paragraphs 10 and 11.

20     Number 12, you Dean that the defendant conducted

21 street sales with Keith Ashford, Marcus Massey and Eric

22 Sampson and Mark -- Mack Hopper.  Cedric Dean was not

23 present when any assault occurred on Keith Ashford, and

24 therefore, has no firsthand knowledge as to the accuracy

25 of this report.  There is no evidence that I recall from

1  the trial that Mr. Dean was present during the assault
2  that was mentioned.

3  MS. SHAPPERT:  Your Honor, the United States is
4  not contending that he was present.

5  THE COURT:  I understand that the government does
6  not contend that.  So your client is not being held
7  responsible for that, Ms. Rausher.

8  MS. RAUSHER:  I understand that, Your Honor, but
9  Paragraph 12 talks about Keith Ellis Ashford being
10  involved with Marcus Massey, Eric Sampson, Cedric Dean
11  and Mack Hopper.  Then subsequently, later in the
12  paragraph they talk about the beating that occurred to
13  Mr. Ashford.  I want it clear for the report that
14  Mr. Dean was not present during that beating, because
15  you're looking at a paragraph and there are several
16  things talked about in that paragraph, and if you were
17  to glance at it, it would look like it's all part of a
18  conduct involved with these individuals, and Mr. Dean
19  had nothing to do with that.

20  THE COURT:  Well, he is not mentioned in
21  connection with the assault.  He is mentioned in
22  connection when the testimony of the trial that he was
23  involved in street sales, but he is not mentioned in
24  connection with the assault.

25  MS. RAUSHER:  And that's correct, but the way

1    this paragraph is, it's misleading.  They start talking

2    all of these people being involved together, and then

3    they go right into Mr. Ashford's beating.  And I think

4    without a sentence saying Mr. Dean was not present, I

5    think somebody could make that jump.

6         THE COURT:  Maybe somebody could make that jump.

7    I don't think the paragraph is misleading, but if you

8    are concerned about it, then we will add a sentence to

9    the presentence report that simply says there is no

10   evidence that Mr. Dean was present during the assault.

11        MS. RAUSHER:  Thank you, Your Honor.

12        THE COURT:  Paragraph 13, you Dean the facts as

13   stated in this paragraph.  From the testimony elicited

14   at trial, Mr. Reagan stated that eight ounces were taken

15   and that he was not injured or pistol whipped.  I

16   thought the evidence was that nine ounces -- there was

17   evidence that nine ounces were taken and one ounce was

18   returned, which I think means that nine ounces were

19   taken, even though you return it.  That's what I

20   understood the evidence to be.  But there was no

21   evidence that he was pistol whipped or injured in that

22   matter, do you disagree with that, Ms. Shappert?

23        MS. SHAPPERT:  No, I agree with that, Your Honor.

24        THE COURT:  All right.  So what do you say, then,

25   as to Paragraph 13, what do you say the evidence was as

1  to any drug amounts or money that was taken,

2  Ms. Rausher?

3      MS. RAUSHER:  Well, according to testimony at

4  trial, Damon Reagan testified that no money was taken.

5  He testified that nine ounces was taken and that one was

6  returned and that he wasn't pistol whipped.  So I submit

7  to the Court that that paragraph should be rewritten to

8  reflect the trial testimony and that --

9      THE COURT:  The trial testimony was nine ounces

10  were taken and one was ultimately returned to him,

11  wasn't it?

12      MS. RAUSHER:  That same day.  So I would

13  certainly submit eight ounces were taken overall.

14      THE COURT:  I understand that position.  I think

15  I probably will disagree with that one a little bit, but

16  nevertheless, let me see what the government says.

17      MS. SHAPPERT:  Your Honor, nine ounces were taken

18  according to the evidence at trial, and the victim was

19  kidnapped.  I thought some money was taken, and I'm

20  having the agent check.  It was -- I'm not positive on

21  that, but I do contend that nine ounces was taken, one

22  was returned and the victim was kidnapped according to

23  his testimony, according to what Mr. Massey testified to

24  and according to what Mr. Hopper said that he learned

25  from Mr. Massey.

11

| | |
|---|---|
| 1 | THE COURT: All right, just a moment. |
| 2 | MS. RAUSHER: Your Honor, I would direct the |
| 3 | Court's attention to Page 515 of the transcript where it |
| 4 | says on Line 14 -- |
| 5 | THE COURT: Hold on just one moment if you will. |
| 6 | MS. SHAPPERT: Ms. Rausher is correct in her |
| 7 | reading of the transcript, it says no money or jewelry |
| 8 | was taken and the government agrees, that's what Page |
| 9 | 514 says. |
| 10 | THE COURT: What my notes say is that Dean wanted |
| 11 | nine ounces of crack for $7,500 and that Officer Johnson |
| 12 | stopped the car, Massey had $1,100, Dean had $1,560 and |
| 13 | that Dean told him that he was -- he and Massey were |
| 14 | pooling their money to buy cocaine. Now, was that |
| 15 | correct or incorrect, Ms. Rausher? |
| 16 | MS. RAUSHER: Your Honor, according to the |
| 17 | transcript of Mr. Reagan, he says that no money or |
| 18 | jewelry was taken from his house. |
| 19 | THE COURT: Well, what about the money that |
| 20 | Mr. Massey and Mr. Dean had on them that Officer Johnson |
| 21 | said Mr. Dean said they were pooling their money to buy |
| 22 | cocaine, or do you disagree that they said that? |
| 23 | MS. RAUSHER: Well, Your Honor, that's not what |
| 24 | Paragraph 13 says. |
| 25 | THE COURT: I understand that, but I'm just |

1    trying to get that whole scenario out of the way at one

2    time.   Paragraph 13 does not deal with that portion of

3    it, but what do you say as to the facts are pertaining

4    to this scenario, this one scenario with Mr. Reagan?

5         MS. RAUSHER:   Your Honor, I -- quite frankly, I

6    didn't look specifically at Officer Johnson's testimony

7    regarding the drug proceeds and I'm sure your notes

8    reflect that.

9         THE COURT:   I'm not sure.   Would somebody look at

10   that, because I don't want to depend on my notes only on

11   this thing.

12        MS. SHAPPERT:   Your Honor, I think it's around

13   Page 553 where Officer Johnson said that Mr. Dean had

14   $1,560 on him and Massey had $1,100 on him.   That's Page

15   553 of the transcript, that is Volume 3.

16        THE COURT:   All right.   Did Dean tell Mr. Johnson

17   that they were pooling their money to buy cocaine?

18        MS. SHAPPERT:   I think they told Investigator Ken

19   Clark, Your Honor, we'll check.

20        (Pause.)

21        MS. SHAPPERT:   Your Honor, I believe it's Page

22   572, the testimony of Investigator Ken Clark, and the

23   question was, and did he advise you that he and

24   Mr. Massey were pooling their money to purchase the

25   cocaine, the attention from Investigator Clark was, yes,

1    ma'am.

2         THE COURT:  All right.  So on Number 13, there

3    was money found on these two people, Mr. Dean said that

4    it was for buying cocaine, and the evidence it seems to

5    me is that there was nine --

6         MS. SHAPPERT:  Yes.

7         THE COURT:  -- ounces taken and one returned from

8    the evidence in the case.

9         MS. SHAPPERT:  That's what the evidence states,

10   Your Honor.

11        THE COURT:  Number 14, denied, defendant denies

12   knowledge of any drug dealing between Marcus Massey and

13   Andre Jackson and denies possession of a firearm that

14   was seized from Marcus Massey's car.  Well, there was

15   evidence that the -- that the gun was seized from Marcus

16   Massey's car, wasn't there?

17        MS. SHAPPERT:  Yes.

18        THE COURT:  But your client says, it wasn't

19   mine?

20        MS. RAUSHER:  That's correct.

21        THE COURT:  What about, Ms. Shappert, is there

22   anything in the trial transcript that discusses the

23   Marcus Massey and the Andre Jackson?

24        MS. SHAPPERT:  Your Honor, there is a great deal

25   in the transcript, and part of it would be at Pages 101

1   through 103, which I believe is the testimony of Hopper

2   who said that the guns were discussed prior to going to

3   that deal, the January flex deal, and then there is

4   testimony at Pages 293 through 94 which -- where I

5   believe Mr. Massey said that Dean and Sloan were in

6   Massey's car with a 9 millimeter and a Colt .45, and

7   Dean later told Massey that Tony Sloan had Dean's .45

8   under his lap and Dean had the 9 millimeter under his

9   seat.  That also appears at Pages 448 and 449, I believe

10  it's 448-49 where Mr. Massey clarifies that the 9

11  millimeter was underneath Cedric Dean.  But again,

12  Hopper and Massey both testified about discussions of

13  guns prior to going to the flex deal.  The guns we would

14  submit were for cover.

15          THE COURT:  Let me ask you this -- well, first we

16  will deal with what we have before us.  What do you say

17  to that, Ms. Rauscher?

18          MS. RAUSHER:  Well, Your Honor, the testimony of

19  Mack Hopper and Marcus Massey differ as to what

20  firearms, in fact, Mr. Dean had.  One says it was a 9

21  millimeter and the other says it was a .45.

22          THE COURT:  So it comes down really to a matter

23  of credibility of the witnesses at that point

24  ultimately, is that right?

25          MS. RAUSHER:  Your Honor, I think the testimony

1    was, I think it was Hopper but I can find it, both of

2    them said that the .45 and the 9 millimeter, that Cedric

3    Dean had prior to the flex deal on that date before they

4    went to do the flex deal.

5         THE COURT: All right.

6         MS. RAUSHER: That is not my recollection of the

7    actual trial testimony.

8         THE COURT: Let me look here just a moment.

9         MS. RAUSHER: And I hate to do this, Your Honor,

10   but if I could jump back, did you rule on Paragraph 13

11   as to what it would read? That was the Damon Reagan

12   robbery, and I apologize, that was the nine ounces, one

13   was returned.

14        THE COURT: Did I rule on that? I ruled that --

15   I have not finally ruled on anything yet, but I am

16   giving you my preliminary findings now so that you may

17   bring them up if you want to. If you don't bring them

18   up later, they will be my findings. But my findings now

19   will be that there is no evidence that he was injured or

20   pistol whipped, but there is evidence that nine ounces

21   was taken from Mr. Reagan, one of which was ultimately

22   returned but is still calculated. Anything else?

23        MS. RAUSHER: And the information about the

24   $2,300 in drug proceeds that was taken, is that also --

25        THE COURT: Yes, the drug proceeds will be used

1  to calculate an amount of drugs that could be bought for

2  that.  So the amount that they had on them will be used

3  for the purposes that Mr. Dean said that it was for.

4          MS. RAUSHER:  Well, I would object to that

5  conclusion, Your Honor, because as the Court is well

6  aware, Mr. Massey and Mr. Dean were arrested, that money

7  was seized, it was not used as proceeds to purchase

8  drugs and, in fact, it was --

9          THE COURT:  It was being used to purchase drugs.

10         MS. RAUSHER:  No, Your Honor, that wasn't the

11  testimony at trial.  The testimony at trial was that

12  Mr. Dean and Mr. Massey met with Mr. Reagan, and if you

13  believe the government's testimony, they went there to

14  rob Mr. Reagan of drugs.

15         THE COURT:  Yes.

16         MS. RAUSHER:  Not to purchase drugs from him.  I

17  mean, they were talking about it, but that wasn't

18  something that, in fact, occurred.

19         THE COURT:  I believe my recollection is that he

20  testified -- or not testified, but he told the officers

21  that the money was to be used, pool their money to buy

22  drugs.  Now, why wouldn't the money that was taken from

23  them be used in the calculation, then, if you believe

24  that he told the officer that?

25         MS. RAUSHER:  I would object, then, to what

1   relevance that would have. I mean, regarding Paragraph
2   13, it talks about drug proceeds regarding Damon Reagan,
3   that these were items taken from Damon Reagan's house,
4   and now we are talking about money that was seized from
5   Mr. Dean and Mr. Massey.

6           THE COURT: Oh, okay, I have no objection to
7   doing it that way. But it seems to me that we are
8   talking about nine ounces from Mr. Reagan, that
9   concludes anything dealing with Mr. Reagan, but at the
10  time that they had the money on them that was pooled for
11  the purpose of buying drugs to further the conspiracy,
12  it seems to me that that should be calculated.

13          MS. RAUSHER: Well, I would object, Your Honor.
14          THE COURT: What basis?
15          MS. RAUSHER: Except for a statement made to the
16  police officer.

17          THE COURT: By Mr. Dean.

18          MS. RAUSHER: Right, but there is no other
19  evidence that that, in fact, happened, that there was a
20  source they were going to purchase it from or anything
21  else. If you recall, Mr. Reagan testified that there
22  was going to be, quote, unquote, a sale that occurred.
23  I'd submit to you that that money was going to be used
24  to purchase the drugs from Mr. Reagan, but it ends up,
25  according to the government's evidence, it was taken

1  from him. So it all was part of the same transaction,
2  same amount.
3        THE COURT: I don't -- how can it be the same
4  amount?
5        MS. RAUSHER: Because if you are going to
6  someone's house and you're going to show them money as
7  if you're going to buy drugs and then you end up taking
8  the drugs, that essentially is double counting.
9        THE COURT: Okay, they took the drugs, but he
10 said, Mr. Dean said that the money was for the purpose
11 of buying drugs. He didn't say it was for the purpose
12 of buying drugs from Mr. Reagan, did he?
13       MS. RAUSHER: And he didn't say that it wasn't
14 either.
15       THE COURT: That's right.
16       MS. RAUSHER: And to make that leap is unfair,
17 especially --
18       THE COURT: I don't find that's an unfair leap to
19 make.
20       MS. RAUSHER: I submit, Your Honor, it's not
21 supported by the evidence.
22       THE COURT: Well, I submit that it is supported
23 by the evidence that it was to be used to purchase
24 drugs. He didn't purchase drugs from Mr. Dean. Do you
25 have a different opinion on that, Ms. Shappert?

1    MS. SHAPPERT: Your Honor, I do not disagree. I
2    do think that the clear import of the testimony was that
3    the money was a flash roll. I would submit that it very
4    well could have been used to purchase additional drugs,
5    but I think with regard to the episode at the Reagan
6    residence, the witnesses testified it was their flash
7    roll.
8    THE COURT: Who testified to that?
9    MS. SHAPPERT: I believe it was Massey. I will
10   have to look for that, Judge, I don't -- I can't give
11   you the page cite, but the purpose of the money as I
12   understood it was to flash it. But I could be wrong on
13   that.
14   THE COURT: I don't remember the evidence of
15   that, but it may be there.
16   MS. RAUSHER: Your Honor, the reason I bring that
17   up is that is my recollection as well.
18   THE COURT: Well, let me see that.
19   MS. RAUSHER: I don't happen to have a report or
20   whatever, but I think it's in Mr. Massey's testimony.
21   THE COURT: Well, let me see that, please.
22   MS. RAUSHER: Your Honor, on Page 271.
23   THE COURT: Of which volume?
24   MS. RAUSHER: Volume Two.
25   THE COURT: All right.

MS. RAUSHER: If you start around Line 11, it
says, when he was in the bedroom, Cedric sat on the left
side the bed, I guess, towards the wall where the window
was. Damon was across where the dresser was, so
Mr. Damon Reagan told us, he said, where is the money
at? Cedric said, where is the dope at, where's the
drugs at? He said, I got the drugs, where is the
money? So Cedric pulled the money out and showed him
the money.

THE COURT: Okay.

MS. RAUSHER: And, Your Honor, that's the money
that they had when they were arrested.

THE COURT: Okay.

MS. SHAPPERT: The money is also referred to at
the bottom of Page 272, but it doesn't give the
context.

MS. RAUSHER: And at that point, it says that
Mr. Dean pulled the money in the bedroom and it was
approximately $2,400, I believe.

THE COURT: Okay, if you believe what Mr. Dean
said to the officers, that we pooled our money to buy
drugs, to buy drugs, why would the government be limited
to the use of the $2,400 in connection with the
robbery? They weren't buying the drugs.

MS. RAUSHER: But, Your Honor, when you look at

1    the light of the testimony and what occurred, that --
2    the circumstance where the statement was taken and what
3    had just transpired, this was the end of August when
4    Mr. Reagan was robbed, the testimony from Mr. Reagan and
5    they came to the house and it was supposed to be a drug
6    deal.  Mr. Reagan says that he was robbed of the
7    money --

8         THE COURT:  He was robbed of the drugs.

9         MS. RAUSHER:  Robbed of the drugs, during the
10   transaction he was shown money.

11        THE COURT:  Yes.

12        MS. RAUSHER:  And at that point, the drugs were
13   taken, and then shortly thereafter when the police came
14   and arrested him, all part of the same transaction.

15        THE COURT:  I understand that, I have no problem
16   with that being part of the same transaction.  But
17   nevertheless they still have approximately $2,400, which
18   they have said was for the purpose of buying, pooling
19   their monies to buy drugs according to Mr. Dean.

20        MS. RAUSHER:  And that, in fact, when he is
21   telling the police officer what happened earlier that
22   evening, he is talking to the police officer about what
23   happened that evening, he is explaining about what the
24   robbery was.

25        THE COURT:  He never intended to buy it, he

```
1   intended to rob for the drugs, didn't he?
2              MS. RAUSHER:  May I have one second, please?
3              THE COURT:  Yes.
4              MS. RAUSHER:  One other thing, Your Honor, if you
5   recall, it's my understanding and I will look in the
6   record, Mr. Massey testified that he and Mr. Dean got
7   together a story about what they were saying happened
8   that night, but it was a lie.  If you recall, Mr. Massey
9   said that what they both told the police that night was
10  a lie because they were alleging -- they were denying
11  that it was robbery, that it was drug deal gone bad.
12  And so therefore, the money that was involved and seized
13  is all part of that same transaction, whether -- and to
14  make the inference that it was for drugs for something
15  else, I think, is not supported by the record.
16             THE COURT:  Well, let's assume that that is
17  correct, that everything that was said there was a lie,
18  let's assume that for a moment.  Nevertheless, they told
19  the officer certain things which appear in the record.
20  Well, if that money was for a flash roll to flash in
21  front of Mr. Reagan to get his drugs and keep the money,
22  then the money clearly has some other purpose for which
23  it can be used later on.  There is no reason that I have
24  seen in this record that shows that Mr. Dean had any
25  need nor $2,400 other than buying drugs and selling
```

1    drugs.

2         MS. RAUSHER:  Well, Your Honor, I think that to

3    make that argument, then you'd say that the flash roll

4    then was used in another robbery, or it was used to

5    purchase a Cadillac.  There is testimony in the record

6    about buying a car.  I just don't think based on the

7    record to make that kind of leap when we have a set

8    period -- a set time frame involving that money, we

9    don't know where, in fact -- yes, we do know where that

10   money went, it was seized, so we know it wasn't used for

11   something else.  And clearly the government used

12   Mr. Dean's statement as a lie.

13        THE COURT:  As a what?

14        MS. RAUSHER:  As a lie, that they were lying to

15   the police officers that day.  This is the government's

16   contention, we have to take the light most favorable to

17   the government.  So it's a lie that Mr. Dean said that

18   we, in fact, were going to use that money to buy drugs,

19   and you can't use that evidence to --

20        THE COURT:  I don't know that the government ever

21   said that that was a lie, what Mr. Dean said, not in

22   their argument that I remember.

23        MS. RAUSHER:  Marcus Massey, one of the witnesses

24   that the government put up, said that.

25        THE COURT:  Yes, I understand that.  The

1    government does not vouch for everybody that it puts up,
2    but it puts up, as you do, people who you believe are
3    going to tell it and then the Court has to make a
4    decision on it. If this were by a different weight of
5    the evidence, perhaps. But when it's by a preponderance
6    of the evidence, it seems to me that whether it was used
7    in that robbery or not is completely irrelevant to a
8    final determination of whether you consider people who
9    have -- who are in the drug business who carry money on
10   them, can that money be calculated. And it seems to me
11   that by preponderance of the evidence, it can be.

12          I understand what your position is on that,
13   Ms. Rauscher, and I think it's clear on the record.
14   What I'm saying at this point is that I will calculate
15   the nine ounces clearly, and I would find by the
16   preponderance of the evidence that there is no other
17   explanation for the use of that money except that which
18   Mr. Dean said, that was that it was to be used in a
19   pooling effort to purchase drugs.

20          MS. RAUSHER: Then I would like my objection
21   noted that I consider that double counting, that it's
22   all part of the same transaction.

23          THE COURT: And I will also find that it was used
24   in this to flash the roll in the perpetuation of the
25   robbery, but that did not lessen the use of that money

1   in any other source that they may wish to buy drugs
2   from.

3         All right, now we are moving on from 13, is that
4   clear, everything in 13? We talked about 14, and I
5   would tentatively find that there is evidence that the
6   gun was used, was possessed by Mr. Dean in Paragraph
7   14.

8         15, defendant denies distributing in excess of
9   1.5 kilograms with Keith Ashford, Moore, Oliver and the
10  others in this area.

11        Let me ask you your opinion first, Ms. Rausher.
12  As the Court recalls the evidence, there is evidence
13  from Mr. Massey, Mr. Hopper, or both, that flex
14  operations were part of the conspiracy so that they
15  could have more money to buy drugs. Ordinarily in a
16  substantive case, if there is a flex, let's say in a
17  substantive case nothing else appearing, a person says
18  ten ounces one time and ten ounces of flex another time,
19  then it occurs to me that that person should be -- have
20  in the calculation only ten ounces of drugs because he
21  didn't distribute more than ten ounces of drugs. But if
22  you have a conspiracy to carry on a drug business and
23  part of the distribution is actual crack and part of it
24  is flex, does that make any difference in your thinking
25  of how the Court should calculate or not?

1      MS. RAUSHER:  Your Honor, my opinion is that when

2    we are dealing with controlled substances, the amounts

3    that should control are, in fact, those amounts which

4    are considered controlled substance and are violations

5    of the law, and that any other amounts of drugs that are

6    not and don't come under the controlled substances act

7    should not be counted.

8      THE COURT:  So if a person has, to change the

9    subject slightly, but a person sells ten ounces of crack

10   and at the same time has $7,500 or $10,000 on them, the

11   Court can't consider the money, they can only consider

12   the actual sale of the crack?

13     MS. RAUSHER:  Without any other proof or -- yes.

14   I mean, if people are -- you're certainly allowed to

15   carry money, you are not allowed to carry drugs.  Now, I

16   know, in fact, there is some -- there is case law out

17   there regarding use of money, but I would submit there

18   has to be more than someone on the street possessing or

19   selling drugs and having money and making that --

20     THE COURT:  Then that gets me back to my original

21   question.  There is testimony that the flex operations

22   were for the purpose of making more money so they could

23   buy more drugs.  Do you say, then, that the Court cannot

24   count the flex operations or can count it in this

25   conspiracy?

1          MS. RAUSHER: My argument, Your Honor, would be

2     that they shouldn't be allowed to count it.

3          THE COURT: Why?

4          MS. RAUSHER: Because why is selling -- why is

5     selling somebody something that's an artificial

6     substance illegal?

7          THE COURT: Only to get the money to buy drugs.

8          MS. RAUSHER: Then there has to be credible

9     evidence that that money was used and it became part of

10    the drug transaction, but I'd submit to the Court that

11    in this case there isn't sufficient evidence beyond --

12         THE COURT: But there is evidence from at least

13    two of the participants that that's what the money was

14    used for, to buy drugs.

15         MS. RAUSHER: I understand that two of the

16    witnesses have said that.

17         THE COURT: Is it a matter of credibility or is

18    it a matter of legal determination in your opinion that

19    the Court can or cannot count flex in this conspiracy?

20         MS. RAUSHER: Your Honor, I would argue with

21    both. I mean, I know once you've got a credibility

22    issue -- and one of the things in this case, the jury

23    certainly wasn't asked to make any determinations about

24    amounts or believability regarding different actions

25    except for the playground. There was a special verdict

1 form regarding it. But the rest of it is left to Your
2 Honor to make determinations as to what, in fact, the
3 government has proved regarding drug quantity.

4 THE COURT: All right, I understand your position
5 on that. Let me ask, Ms. Shappert, what your position
6 is on that, on the question that I'd asked,
7 Ms. Shappert.

8 MS. SHAPPERT: Your Honor, I would submit it's a
9 question for the Court to decide based on the
10 credibility of the witnesses. We did hear testimony in
11 this trial that these acts were committed, the flex
12 deals were in furtherance of the drug conspiracy.
13 Therefore, the money that was reinvested into the
14 purchase of drugs, those drugs are reasonably
15 foreseeable to this conspiracy, and yes, I do believe
16 the Court can look to the flex transactions.

17 THE COURT: What if you don't know that the money
18 was, in fact, reinvested but that was the purpose of the
19 money?

20 MS. SHAPPERT: We have testimony that it was
21 reinvested, and I think it is for the Court to decide
22 whether to believe that testimony.

23 THE COURT: But from your standpoint from a legal
24 conclusion, flex ordinarily would not be counted in a
25 substantive count?

1          MS. SHAPPERT:  Yes, that's correct, I agree.

2          THE COURT:  But when it is a part of the

3    conspiracy operation as testified to here, then if you

4    pass the credibility matter on it, then you can consider

5    it, is that what you are saying?

6          MS. SHAPPERT:  Yes, Your Honor.  And what I'm

7    saying is that we know for purposes of determining the

8    amount of drugs reasonably foreseeable, the Court can

9    look to assets in the drug conspiracy and use the assets

10   to determine the amount of drugs.  In this case, assets

11   from flex deals, for example, the January '95 takedown

12   episode involved $7,500 in cash.  The intent was to

13   obtain that cash, and the testimony of Marcus Massey was

14   that the monies were being reinvested to buy drugs.  So

15   it's not -- you can't look at the flex and say nine

16   ounces of flex equals nine ounces of crack cocaine.  We

17   can look at the money and say how much crack would that

18   money buy.

19         THE COURT:  All right, Ms. Rausher?

20         MS. RAUSHER:  Your Honor, I just draw the Court's

21   attention that, in fact, the testimony at the trial

22   regarding Marcus Massey, and I'm citing in Volume 2,

23   Page 292, where Mr. Massey was asked about flex deals,

24   did you ever sell flex to other drug dealers, several

25   times was his attention.  When you sold flex to other

1   drug dealers, what would you do with the money you made

2   from selling the flex? He said, reinvest it back into

3   the drugs and buy clothes and cars.

4       Now, there is no testimony in the record

5   regarding percentages of what, in fact, was reinvested,

6   what was spent on clothes or what went to cars. In

7   fact, if I recall my cross -- the cross-examination of

8   Mr. Massey about how much money he made, he wasn't able

9   to say.

10       Therefore, to make a determinations about what,

11  in fact, was or wasn't reinvested would be totally

12  speculative, especially in light of that statement where

13  he says it was reinvested in things that aren't

14  necessarily drug-related.

15       THE COURT: All right.

16       MS. SHAPPERT: Your Honor, I would simply submit

17  it is no more speculative than looking at in a different

18  case all the assets of a drug dealer and saying based on

19  the houses, the swimming pools, the cars, this is how

20  much dope or the quantity of drugs reasonably

21  foreseeable to the defendant. I agree it's not a

22  precise science, but I would say certainly the

23  preponderance of the evidence supports that flex deals

24  were in furtherance of the drug conspiracy.

25       THE COURT: All right. I would find that in this

1   case, the flex deal itself cannot be considered for

2   calculation of drug quantities, but the amount of money

3   could be because the money was for the purpose of,

4   according to Mr. Massey, buying drugs, and other things,

5   too, perhaps.  But on the question of weight of the

6   evidence that I have to decide, once an amount of money

7   that is in part or all to be used for purchase of drugs,

8   absent some evidence to show that it was not used for

9   the purchase of drugs, the Court would find that that is

10  calculable and should be used to determine, provided,

11  however, that there has got to be some showing of what

12  the cost of the crack was in the area at that time.  It

13  may have been done in this trial already, but I'm not

14  sure of that.

15       Number 15, is that the next one, Paragraph 15,

16  Dean -- 16, denies involvement in acts contained in

17  Paragraph 16.  Was there evidence about Butter Bean, two

18  ounces, Gene Butter Bean, two ounces, as contained in

19  Paragraph 16 of the presentence report?

20       MS. SHAPPERT:  Your Honor, that did not come out

21  at trial.

22       THE COURT:  That should be out, subject, of

23  course -- both sides -- what I am trying to do is based

24  upon the evidence that you are presenting to me now and

25  based upon my notes, I'm trying to go through here and

```
 1    say this is supported or it is not supported.  Each side
 2    is -- certainly will be given an opportunity to add any
 3    evidence that you want on calculation of offense levels
 4    or criminal history if you wish, but at this point I
 5    know of no evidence on Gene Butter Bean.  Do you say
 6    there was no evidence of the Abdulla robbery?
 7              MS. RAUSHER:  No, Your Honor, there was evidence
 8    at trial about that.
 9              THE COURT:  Okay, you disagree on a credibility
10    matter?
11              MS. RAUSHER:  That's correct.
12              THE COURT:  And was there any evidence at trial
13    about the use of your client of a 9 millimeter Glock
14    during this robbery?
15              MS. RAUSHER:  I don't recall specifically that
16    being used.  My recollection was a 9 millimeter or
17    a .45.  I think Mr. Hopper and Mr. Massey differed about
18    that.
19              MS. SHAPPERT:  Your Honor, they did differ.
20    Mr. Hopper said that he carried a .38 and Dean carried a
21    chrome .45.  That was Pages 75 through 77 of the
22    transcript.  In Marcus Massey's testimony, he said
23    during the Abdulla robbery, that Mr. Dean carried a
24    Glock 9 millimeter, Pages 283 to 285 of the transcript.
25              THE COURT:  All right.  On the credibility
```

1  matter, I would find in Paragraph 16 that there was a

2  robbery of seven ounces of cocaine and that a gun was

3  used during this robbery, carried during the robbery by

4  Mr. Dean.

5       18, defendant denies soliciting Timothy Haynes

6  and Lester Woods to testify in his behalf.  No evidence

7  of that, is there?

8       MS. SHAPPERT:  Your Honor, we are prepared to

9  call a witness on the obstruction, but there was no

10 evidence at trial, I don't believe.

11       THE COURT:  So at this point, there is no

12 evidence for me to consider on that, and at this point,

13 I would find there is no evidence of that, subject to

14 your right to call.

15       Paragraph 22 is essentially the same thing.  We

16 will have to make a calculation as to what the Court

17 finds, but you properly say that your client did not --

18 was not involved in the distribution of cocaine base in

19 the conspiracy.

20       Paragraph 23 denies again the possession of the

21 firearm during the conspiracy.  There is at least

22 testimony, believable or not believable, by Mr. Hopper,

23 Mr. Massey, Sabrina Massey and perhaps others.

24       MS. SHAPPERT:  Yes, I believe also Purvis Montez

25 testified.

1          THE COURT:  Montez.

2          MS. SHAPPERT:  Yes.

3          THE COURT:  That's right, that your client did,

4     in fact, carry guns during this conspiracy in

5     furtherance of the conspiracy, and, of course, at one

6     time he was found with a gun at least located in the

7     seat where he was at the time of his arrest.  I

8     understand that's a credibility matter, is that

9     correct?

10         MS. RAUSHER:  That's correct, Your Honor.

11         THE COURT:  All right.  And the special verdict,

12    you disagree that there was evidence that this was

13    within 1,000 feet of the public housing development.

14         Count 6 involved Marcus Massey and Andre Jackson,

15    the drug deal whereby Mr. Dean was arrested and the

16    firearm was recovered from the car he was in.  We have

17    been over that one.

18         29, we been over that one.  30, been over that

19    one.  And 31, Paragraph 31 --

20         MS. RAUSHER:  Your Honor?

21         THE COURT:  Yes.

22         MS. RAUSHER:  It's my understanding based on the

23    objections I initially filed --

24         THE COURT:  Yes, ma'am.

25         MS. RAUSHER:  -- that all of these -- that this

1     is incorrect calculation, that the probation officer

2     didn't have the transcript, and that this section

3     doesn't apply to the Damon Reagan robbery.  Therefore,

4     all of these enhancements are not applicable.

5          THE COURT:  Say again why they are not

6     applicable.

7          MS. RAUSHER:  This count, Count 6, didn't do --

8     didn't have to do with the Damon Reagan robbery, this

9     had to do with the January 20th, 1995 arrest at the

10    Kentucky Fried Chicken.  Therefore, this was -- these

11    different enhancements were a mistake, and it's my

12    understanding that the government conceded that as well.

13         MS. SHAPPERT:  The government doesn't agree.

14    Your Honor, we concede that those are -- first of all,

15    we would concede that based on trial testimony, there

16    was no injury to Damon Reagan.  He testified he wasn't

17    injured.  We would argue that the robbery enhancement

18    would be applicable with regard to the Damon Reagan

19    episode, but we agree with Ms. Rauscher, it is not

20    applicable to Count 6.

21         THE COURT:  All right, that's fine.

22         And the next one, then, would be Paragraph 38,

23    obstruction of justice, and I don't have any evidence --

24         MS. RAUSHER:  No, 37, Your Honor.

25         THE COURT:  37?

1        MS. RAUSHER:  The role enhancement.

2        THE COURT:  Enhancement under the facts

3   established in the record are not warranted.  All right,

4   37, I'll be glad to hear you on that.

5        MS. RAUSHER:  Your Honor, in the report, there is

6   an allegation that Section 3B1.1(b) should apply and

7   that Mr. Dean should be given a three-point enhancement

8   due to his role as a manager, supervisor.  I'd submit to

9   the Court, Your Honor, that the record does not warrant

10  a three-point enhancement.

11       First of all, I would direct the Court's

12  attention to Marcus Massey's testimony, that his

13  enhancement was a two-point enhancement, and he clearly

14  was considered a leader of this conspiracy.  The only

15  person who, in fact, testified as to anyone working for

16  or being supervised by Mr. Dean was Mr. Massey.  And in

17  the trial transcript, he lists the same number of

18  individuals for himself, for Mr. Sampson and Mr. Dean as

19  the same number of people.  I'd submit to the Court that

20  there isn't enough evidence to show that Mr. Dean had

21  any kind of management or supervisory role that would

22  warrant a three-point enhancement.

23       THE COURT:  Mr. Massey did testify that there

24  were other people working for him.  What about the

25  testimony of Mr. Little?  What I have in my notes is

```
 1   that Sampson had people selling for him, me, Puff,
 2   Richardson, Funderburk, and cooking for him was Tony
 3   Moore.
 4          MS. RAUSHER:  That's Eric Sampson, Your Honor,
 5   not Cedric Dean.  He's talking about Eric Sampson.
 6          THE COURT:  I'm sorry about that, you are right.
 7   Okay.
 8          MS. SHAPPERT:  Your Honor, what I have is that on
 9   Page 261, that Mr. Massey said that persons who worked
10   for Cedric Dean included Mr. James, J.C. Jeter,
11   Ms. Georgia Jeter, Ms. Joanne Davis, May Moore, and,
12   quote, two in Windsong Trail.  He also testified on
13   Pages 263 to 264 that Sabrina Massey cut a quarter-ounce
14   of crack cocaine for Mr. Dean on one occasion.  Sabrina
15   Massey corroborated this in her testimony.  She was not
16   clear on dates, but she did say when both Massey and
17   Dean were out of jail that this occurred, and she cut up
18   crack for Mr. Dean one occasion, Pages 458 to 459.
19   Purvis Montez testified on Page 697 that Dean and Massey
20   both provided him with crack to sell, and Montez also
21   testified on Page 699 that junkies and crack addicts
22   worked for Dean.
23          I would submit that the testimony in this trial
24   establishes that there were five or more persons in this
25   conspiracy, that the conspiracy was otherwise extensive,
```

1    that Dean was supervising people in the Southside Homes,
2    Boulevard Homes area and Windsong Trail.  And the fact
3    that the government negotiated a plea agreement with one
4    of co-conspirators who only got a two-level enhancement
5    would not be dispositive of Dean for a number of
6    reasons, not the least of which is that the evidence was
7    that Dean, in addition to selling with the people in his
8    indictment, had these other two people selling in the
9    Windsong Trail area.  So I would submit that the
10   three-level management enhancement is supported by the
11   preponderance of the evidence.

12            THE COURT:  Well, I don't have any problems
13   finding from the evidence that I heard that Mr. Massey
14   is at the top of the list of people who were involved in
15   the various aspects of this conspiracy.  That's not for
16   me to determine, though, at this point, and what I have
17   to do is review the evidence as to the two people who
18   did not work out pleas and two people against whom the
19   evidence has been presented.

20            Do you, Ms. Rausher, say that the Massey
21   statement is subject to a credibility test?

22            MS. RAUSHER:  Your Honor, not only is it subject
23   to a credibility test, but if you look at where in the
24   record Mr. Massey testifies as to who these people are,
25   he testifies that those are the same people who are

1   working for him.  And then he mentions, and then he
2   goes -- and for Mr. Dean, you will see he make these
3   lists.  When Purvis Montez talks about crack addicts and
4   drugs, we don't even know who, in fact, these could be
5   the same people.  I would submit to the Court that based
6   on the evidence presented and even as a preponderance of
7   the evidence, there is insufficient evidence for this
8   court to find that Mr. Dean was a manager to get that
9   kind of three-level enhancement.

10          THE COURT:  I would find on this evidence that
11  under Mr. Massey's statement in court, that by
12  preponderance of the evidence I can find that though
13  some of these people worked for Mr. Massey, too, George
14  Jeter, J.C. Jeter, Mr. Davis, Oliver and Moore -- strike
15  that.  Jeter, Jeter, Moore and Davis all worked for
16  Mr. Dean, Mr. Montez indicated that he worked for Dean,
17  and for that reason, I would find that he was in more of
18  a position than your salesman, he was a manager of
19  salespeople.  So I think that is appropriately
20  attributed to Mr. Dean.

21          The .38 is something that's subject to proof.  Do
22  you contend that your client is not a career criminal
23  offender because the two -- the robberies took place on
24  the same night, close proximity to each other in time
25  and they were disposed of together and for that reason,

1  there is not a separate -- two separate robberies here,

2  is that correct, Ms. Rausher?

3          MS. RAUSHER:  That is correct, Your Honor.

4          THE COURT:  Is that going to make any

5  difference?

6          MS. RAUSHER:  Your Honor, it could down the line,

7  and so --

8          THE COURT:  I would at this point, I would find,

9  Ms. Shappert, I will give you an opportunity to be

10  heard, but I do believe those were both on the same

11  night and in close proximity to each other, and I would

12  find that those are not separate occasions.

13          MS. SHAPPERT:  Your Honor, at the appropriate

14  time, I would like to call the probation officer.  I

15  believe they were at different locations.

16          THE COURT:  I think that may be true.

17          MS. SHAPPERT:  And the fact that they are at

18  different locations, I think the case law is clear that

19  if they were two victims side by side at the same

20  location, Ms. Rausher would be correct.  But when

21  robberies occur at two different locations, the fact

22  that they are occurring on the same date, they are

23  nonetheless separate episodes, and I would submit that

24  that's an appropriate finding.  I would also note the

25  government did file a notice of intention to seek

1    enhanced penalties for that particular provision.

2         THE COURT:  You did.  And please understand that

3    what I'm trying to do here is go through here and show

4    you what based on the evidence it looks like to me at

5    this point, neither one of you is estopped to present

6    evidence if you want to on each item that I am finding

7    now.  It's only a tentative finding, but sort of get it

8    in shape so we can finish it up sometime.  I think it's

9    appropriate to do what we are doing now, so I will give

10   you an opportunity to do that.  But at this time, I

11   would certainly think that Ms. Rausher's argument is

12   correct based on what I have heard so far.

13        So I believe that takes care of the objections

14   that are not -- you have some other objections, but

15   they're results of calculations based upon what we are

16   finding here now.  Is there any other objection other

17   than the total calculation of things, Mrs. Rausher, that

18   you have that I haven't covered?

19        MS. RAUSHER:  No, Your Honor, those are all the

20   substantive objections to the calculations, and all the

21   other matters were resolved.

22        THE COURT:  And you have no objections to the

23   presentence report yourself, Ms. Shappert?

24        MS. SHAPPERT:  That's correct, Your Honor.

25        THE COURT:  Now, on the question of the

1    enhancements, do you have any additional evidence that

2    you wish to present on the question of calculation of

3    drugs attributable to the defendant, to Dean,

4    Ms. Shappert?

5         MS. SHAPPERT:  Your Honor, I will do it as the

6    Court wishes.  Your Honor heard the testimony at trial.

7         THE COURT:  Yes.

8         MS. SHAPPERT:  Your Honor also has a breakdown of

9    the amounts of drugs in this case.  We submit that the

10   evidence is in excess of 1.5 kilograms.  If the Court

11   wishes additional evidence, the government will present

12   it, but Your Honor heard the trial.

13        THE COURT:  Then do you have evidence that you

14   wish to present on any other enhancements other than the

15   obstruction?

16        MS. SHAPPERT:  Your Honor, just the obstruction

17   enhancement.  Again, we submitted to you the basis for

18   the gun enhancement and the management enhancement.

19        THE COURT:  You did.  Then I will hear you on the

20   obstruction.

21        MS. SHAPPERT:  Thank you, Your Honor.  I will

22   call Agent Modcelewski.

23   JAMES CHRISTOPHER MODCELEWSKI, being first duly sworn,

24   was examined and testified as follows:

25                    DIRECT EXAMINATION

1          BY MS. SHAPPERT:

2     Q.    Agent Modcelewski, would you state your full name

3   for the Court, please?

4     A.    James Christopher Modcelewski.

5     Q.    And by whom are you employed?

6     A.    The Bureau of Alcohol, Tobacco and Firearms.

7     Q.    In that capacity, are you the federal case agent

8   on the investigation of Cedric Dean?

9     A.    Yes, ma'am.

10    Q.    And as part of your investigation, did you

11  uncover evidence that you believed indicated obstruction

12  of justice by Mr. Dean?

13    A.    Yes, ma'am.

14    Q.    Would you reiterate to the Court your findings on

15  that subject?

16         MS. RAUSHER:  Objection, Your Honor, to

17  conclusory statement as to what his findings are

18  regarding his conclusion.

19         THE COURT:  All right, restate the question.

20         BY MS. SHAPPERT:

21    Q.    Agent Modcelewski, as part of your investigation,

22  did you become aware of facts that you felt would be

23  relevant to the Court pursuant to any enhancements in

24  this case?

25    A.    Yes, ma'am.

1    Q.    And with regard to an enhancement pertaining to

2    3C1.1 the federal sentencing guidelines, what, if any,

3    information did you become aware of?

4    A.    We spoke with a Timothy Haynes at the Mecklenburg

5    County Jail.

6    Q.    Was that during the course of trial preparation?

7    A.    Yes, ma'am, it was.

8    Q.    Approximately when did you speak with Mr. Haynes?

9    A.    Approximately a week or two before the trial took

10   place.

11   Q.    And that was in the fall of 1995?

12   A.    Yes, ma'am.

13   Q.    And what, if anything, did you learn in your

14   conversation with Mr. Haynes?

15   A.    Mr. Haynes informed us that he was present, I

16   believe, for both Mr. Sampson and Mr. Dean while they

17   were dealing drugs out in Southside Homes.  Mr. Haynes

18   also indicated that he had been friends with Mr. Dean

19   and that Mr. Dean had approached him and asked him to

20   testify at his trial.

21   Q.    Where did Mr. Dean approach Mr. Haynes about

22   having Mr. Haynes testify at Dean's trial?

23   A.    At the Mecklenburg County Jail.

24   Q.    And what, if anything, did Mr. Haynes relate that

25   he was told or that he said he was told by Cedric Dean?

```
 1        A.    He was asked to testify on Cedric Dean's behalf
 2   by Cedric Dean.  He -- according to what Mr. Haynes told
 3   me was that Cedric Dean told him that, you are on state
 4   charges and the feds can't mess with you if you could
 5   help me out.  Mr. Haynes gave me a piece of paper that
 6   he said Mr. Dean gave to him, it's handwritten.  I don't
 7   believe Mr. Haynes knew for a fact that Mr. Dean wrote
 8   it, but Mr. Dean had handed it to him.
 9        MS. RAUSHER:  Objection, move to strike.
10        THE COURT:  Well, he is saying he doesn't think
11   he knew he wrote it.  You want to strike that?
12        MS. RAUSHER:  That's correct, Your Honor.
13        THE COURT:  Strike that.
14        BY MS. SHAPPERT:
15        Q.    Did Mr. Haynes indicate to you, Agent
16   Modcelewski, did he indicate whether he recognized the
17   handwriting?
18        A.    No, ma'am.
19        Q.    Did Mr. Haynes explain to you what, if any,
20   instructions he received from Mr. Dean about testifying
21   on Mr. Dean's behalf?
22        A.    He gave him this piece of paper.
23        Q.    Gave who the piece of paper?
24        A.    Mr. Dean gave Mr. Haynes this piece of paper that
25   I'm holding and asked Mr. Haynes if he remembers James
```

1    Ervin, and James Ervin, he said, yes, I do remember him.

2    He says, well -- Mr. Dean asked him if he would sign

3    this piece of paper and to testify to it later on in

4    court on his behalf.

5       Q.   And can you read what is on that piece of paper?

6       A.   It says, I, blank, during the month of, blank,

7    recall talking with James Ervin Booby concerning

8    different people we knew on the street. I remember his

9    asking me if I knew Eric Sampson, and I said, the guy

10   who be with Marcus Massey, he said, yeah, that's him. I

11   told him I had a fight with Eric when we were younger,

12   and he said, yeah, I can't stand Eric or Marcus. You or

13   no one else will have to worry about them because I been

14   hit them off. It's just a matter of time and they will

15   be history, even that Ced (Cedric Dean) with his punk

16   self. I asked him what had they done to him. He

17   claimed he just don't like them. So I asked him how he

18   hit them all off, and he claim he talked to some fed

19   agents or police, somebody like that, and told a lot of

20   lies to get them off the street. I told him that was

21   messed up and if he didn't know what goes around, comes

22   around. He claim he was responsible for them being

23   locked up at the time of our conversation. After being

24   moved to another pod, I ran into Eric Sampson, and he

25   was saying a lot of people was lying on him. I then

```
 1      told him what Booby said about him, Marcus and Cedric,
 2      and he asked me to write this statement.
 3          Q.  So did you understand Mr. Haynes to mean that he,
 4      Haynes was to testify that Bobby was saying these
 5      things?
 6          A.  Yes, ma'am, that there apparently was a statement
 7      in a discovery file by James Ervin and he was to be
 8      called as a witness, and they wanted to put Haynes on
 9      the stand I guess, to discredit --
10              MS. RAUSHER:  Objection and move to strike, Your
11      Honor, regarding --
12              THE COURT:  Sustained.
13              BY MS. SHAPPERT:
14          Q.  Is there also handwriting on the back of that
15      handwritten piece of paper?
16          A.  Yes, ma'am.
17          Q.  And what does that appear to be if you know?
18          A.  I can read it if you like.
19          Q.  Is it scratched out?
20          A.  Yes, ma'am, it is.
21          Q.  If you can read it, if you would please.
22          A.  I, Tremius Hall, have been a longtime friend with
23      Marcus Massey and was in pod 1B with him during the
24      month of April of 1995.  We used to talk daily about our
25      situations which resulted in our being in trial.  Marcus
```

1    told me that a lot of people was lying on him and that's
2    why he was down here.  He said that he had to hit people
3    in the head (tell on people) because people was lying on
4    him and he was facing ten to life.

5        Q.   Did Mr. Haynes tell you anything else about his
6    conversation with Cedric Dean?

7        A.   No, ma'am.

8        MS. SHAPPERT:  Your Honor, we would tender that
9    as Government Exhibit 1 for the sentencing hearing, and
10   that would be the evidence for the United States on the
11   obstruction.

12       THE COURT:  Ms. Rausher?

13       MS. RAUSHER:  Your Honor, before cross-examining,
14   if that's the government's evidence, I would submit that
15   that is not evidence of obstruction.  Mr. Haynes,
16   according to Agent Modcelewski, Mr. Haynes had a
17   conversation with Mr. Dean, Mr. Dean gave him the piece
18   of paper and that was it.  He was never called as a
19   witness, this paper was never used and that's where it
20   went.  And I'd submit to the Court at this point, I
21   don't think there is enough evidence and I don't
22   think -- I will certainly cross-examine him further, but
23   I don't think there is enough.

24       THE COURT:  I will overrule it at this point, you
25   may examine.

| | |
|---|---|
| 1 | CROSS-EXAMINATION |
| 2 | BY MS. RAUSHER: |
| 3 | Q. Agent Modcelewski, when you went to the |
| 4 | Mecklenburg County Jail to speak with Timothy Haynes, do |
| 5 | you recall what pod he was in? |
| 6 | A. No, ma'am, I don't. |
| 7 | Q. You are familiar with the setup at the |
| 8 | Mecklenburg County Jail, are you not? |
| 9 | A. I've never been through it, but I'm familiar with |
| 10 | it, yes, ma'am. |
| 11 | Q. In fact, there are numerous pods in the jail and |
| 12 | there is an approximately 50 people in a pod, isn't that |
| 13 | correct? |
| 14 | A. To my understanding, yes, ma'am. |
| 15 | Q. And during the time that you interviewed |
| 16 | Mr. Haynes, he was not in a pod with Mr. Dean, isn't |
| 17 | that correct? |
| 18 | A. I'm not sure. |
| 19 | Q. There was a point in time when Mr. Haynes was in |
| 20 | a pod with Eric Sampson, isn't that correct? |
| 21 | A. I believe so, yes, ma'am. |
| 22 | Q. And, in fact, in your conversations with |
| 23 | Mr. Haynes, did he tell you he had conversations with |
| 24 | Eric Sampson about their trial? |
| 25 | A. I don't recall. |

```
1    Q.    Did you ask him that?

2    A.    I don't recall, ma'am.

3    Q.    When you spoke with Mr. Haynes, did he tell you

4    there was a period of time that he was in the pod with

5    Mr. Dean?

6    A.    Yes, ma'am.

7    Q.    And you said that Mr. Haynes knew Mr. Dean?

8    A.    Yes, ma'am.

9    Q.    And Mr. Haynes also knew James Ervin, isn't that

10   correct?

11   A.    Yes, ma'am.

12   Q.    And did you ask Mr. Haynes about the conversation

13   that he had with Mr. Dean, Mr. Sampson, and/or

14   Mr. Sampson about James Ervin?

15   A.    No, ma'am, we just had a conversation about what

16   Mr. Dean asked him to do.

17   Q.    Did you ask him whether they had had any previous

18   conversations about Mr. Ervin?

19   A.    My understanding of my recollection when we

20   talked to Mr. Haynes was that we got into the pod,

21   Cedric was preparing for his trial, Cedric had

22   approached him and asked him to do this for him.  At

23   that point was when he contacted our office and asked to

24   speak to me.  We went out there, he said that after he

25   told Cedric he was not going to do it, he had no further
```

1    conversations with him.

2    Q. So, in fact, Mr. Dean and Mr. Haynes had a

3    conversation about James Ervin, isn't that correct?

4    A. They had a conversation about -- I reiterate my

5    testimony, was that he asked Mr. Haynes if he, in fact,

6    remembered Mr. James Ervin or Booby, and he said, yes, I

7    do. And Mr. Dean told him about going to trial and that

8    Mr. Ervin made a statement against him and was probably

9    going to be a witness.

10    Q. Did you ask Mr. Haynes what the substance of the

11    conversation Mr. Dean had with him about James Ervin and

12    how they knew one another?

13    A. They knew each other from the block.

14    Q. And Mr. Haynes told you that, is that correct?

15    A. Yes.

16    Q. That he, in fact, did know James Ervin?

17    A. That's correct.

18    Q. Did he tell you how long that he knew him?

19    A. I don't recall, ma'am.

20    Q. Did you ask him that?

21    A. I don't recall.

22    Q. So your testimony is that after Mr. Dean had

23    asked Timothy Haynes if he knew James Ervin, he then

24    gave him the piece of paper, isn't that correct?

25    A. Yes.

1      Q.  And did Mr. -- did Timothy Haynes and Cedric Dean

2    go over the piece of paper?

3      A.  He said, I want you to read this, this piece of

4    paper that I have up here.  He said, I want you to

5    testify in my behalf at my trial as to what is on the

6    paper.

7      Q.  And what did Mr. Haynes say in response to that?

8      A.  No.

9      Q.  He said he wouldn't, isn't that right?

10     A.  That's correct.

11     Q.  And that was it and Mr. Dean didn't do anything

12    else, is that correct?

13     A.  That is correct.

14     Q.  Now, your testimony is that Mr. Haynes had an

15    opportunity to read this, isn't that correct?

16     A.  Yes, ma'am.

17     Q.  Did Mr. Haynes tell him, no, that's not what

18    happened?

19     A.  Mr. Haynes gave me the piece of paper, he said

20    that he had not talked with James Ervin.

21     Q.  No, no, that wasn't my question.  When he was

22    given this paper, did he say anything to Mr. Dean

23    saying, no, I don't know anything about this, or, no,

24    that's not what happened?

25     A.  He said he wasn't lying for him and he wasn't

1  going to do it. Is that what you wanted?

2  Q. That's not my question. When Timothy Haynes got

3  this piece of paper, did he and Mr. Dean -- did he tell

4  you that he and Mr. Dean had a conversation about what

5  was in this piece of paper?

6  A. No, ma'am. He gave him the piece of paper, and

7  he told him that, you know James Ervin, they agreed on

8  that, he knew him from back on the block, he told him

9  about his trial, he said, this is a statement, I would

10 like you to testify to this at my trial on my behalf.

11 Mr. Haynes looked at the statement, he read the

12 statement and said, I'm not lying for you, I'm not doing

13 it. And that was the conversation.

14 Q. So the full extent of the conversation between

15 Mr. Dean and Mr. Haynes was that, no, I'm not going to

16 do this, and that was it, is that correct?

17 A. That's the way they left it, yes, ma'am.

18 Q. Prior to that, did you ask Mr. Haynes about the

19 extent of the conversation he had with Mr. Dean about

20 James Ervin?

21 A. No, ma'am.

22     MS. RAUSHER: I have no further questions.

23     MS. SHAPPERT: No further questions, but I would

24 move to introduce Government Sentencing Exhibit 1 and

25 pass it to the Court if the Court would like to see it.

1        THE COURT:  I think I can recall what was said on

2    that.  You may come down, thank you.

3        MS. SHAPPERT:  That will be the showing on that.

4        THE COURT:  Anything else, Ms. Shappert?

5        MS. SHAPPERT:  No, sir, not on that.

6        THE COURT:  Do you have any evidence you wish to

7    present?

8        MS. RAUSHER:  Yes, Your Honor, we do.  Call

9    Cedric Dean.

10        THE COURT:  You may do so.  You may also renew

11    your motion at this time, too, that you made earlier.

12        MS. RAUSHER:  Your Honor, I am sorry, I'd

13    reiterate the motion and I don't think that there is

14    enough evidence to show there is actually any kind of

15    obstruction.

16        THE COURT:  I think it's a matter of credibility,

17    and one of the difficulties that always presents the

18    Court when they don't see a person who made the

19    statement, you can't judge that person's credibility.

20    This is not a credibility of the officer here that is at

21    stake, it's a credibility of the person who was

22    interviewed, and I don't have anything that would show

23    me anything about that.  There is no indication, though

24    it very well may, be that that note was written by

25    Mr. Dean, and if it were, then that would make a

1   substantial difference. But there is no evidence of

2   that, and for that reason, at this point I would find

3   there is insufficient evidence to establish the

4   credibility of the witnesses in the jail, Mr. Hall and

5   Mr. Haynes and the statements they made, and would find

6   that that would not constitute an obstruction under this

7   evidence.

8       All right. Next, I guess that takes -- that's

9   all of the enhancements, is that correct?

10      MS. SHAPPERT: Yes, sir.

11      THE COURT: Do you have anything that you want to

12   introduce in the way of evidence, Ms. Rausher, on the

13   question of reduction or anything else that you wish to

14   present evidence on, on any of the tentative findings

15   that I have made?

16      MS. RAUSHER: The only item I have evidence on,

17   Your Honor, is the challenge to the convictions.

18      THE COURT: All right.

19      MS. RAUSHER: Would you like that now?

20      THE COURT: You may do so.

21      MS. RAUSHER: Your Honor, I have Defense Exhibits

22   1, 2, 3 and 4. These are the police reports and

23   statements of Mr. Dean and codefendant Antonio Geddes

24   from the arrest for the events of August 7th, 1988.

25      THE COURT: All right.

1    MS. RAUSHER:  And I will pass the originals,
2    well, they're copies of the originals, to the Court.
3         (Pause.)
4         MS. RAUSHER:  Your Honor, what Defense Exhibits
5    1, 2, 3 and 4 show are the indictments and the police
6    reports and the statements from the evening of August
7    the 7th and what happened that evening.  I draw the
8    Court's particular attention to the police report
9    contained in Defense Exhibit Number 3 -- excuse me,
10   Defense Exhibit Number 1, which is a report by Officer
11   Wilson.  And it's very interesting, he has an asterisk
12   in the report and he says, see offense report related to
13   this, and he cites the complaint in the other case.
14        And essentially, Your Honor, what happened, and
15   the reports will reflect, the evening of August the 7th
16   of 1988, Antonio Geddes, Cedric Dean and some other
17   individuals were in a Renault Alliance driving around.
18   They went to Carmel Commons, which is a shopping center
19   on Route 51 in southeast Charlotte.  There, and you'll
20   see from the statement of Antonio Geddes, they met all
21   of the complainants in this case:  John Wright, who was
22   the gentleman in the Army who was robbed in Arborgate,
23   and two other individuals, who were robbed in Cameron
24   Woods.
25        Essentially what happened then is that these

1    individuals were robbed as part of a common plan that

2    evening where they were all to meet the party that was

3    in Cameron Forest and Mr. Wright was to go to Arborgate

4    and they were going to show him where to buy some

5    reefer, and then they robbed him there and then they

6    went over to Cameron Forest and robbed the other two

7    people.

8         The case law, Your Honor, regarding separate

9    episodes, there is quite a bit of case law out there and

10   there are a lot of different factors the Court has to

11   take into consideration.  Just to name a few of them are

12   the geographic location.  Your Honor, I'd submit that

13   the robberies, even though one took place in Arborgate

14   Apartments, another one took place in Cameron Woods,

15   they're all fairly close nearby but all part of the

16   same, similar conduct.

17        You also have to look at mode of operation.  In

18   this case, there were threats with a weapon and chains

19   were taken, similar mode of operation.  The number of

20   victims, there were two victims in the one robbery and

21   the one gentleman in the other.  The number of criminal

22   objectives, you have to look at.  In this case, it was

23   to take the jewelry.  The time elapsing between the

24   episodes, it was a was short period of time; it all

25   happened within an hour and a half of the Carmel Commons

1 and then the actual robbery at Cameron Forest. The type

2 of the offense, the offenses were exactly the same,

3 robbery with a dangerous weapon. And also, the use of

4 the weapon, the weapon used in the robberies were the

5 same.

6      I'd submit, Your Honor, that these are all part

7 of the same criminal episode and should not be separated

8 for guideline purposes.

9      THE COURT: All right. Ms. Shappert?

10      MS. SHAPPERT: Your Honor, I don't disagree with

11 Ms. Rausher's recital of the facts, I do disagree with

12 her interpretation. And I could call the probation

13 officer, but I do believe that Ms. Rausher summarized it

14 accurately and also that the presentence report on Page

15 9 and at the top of Page 10 makes it clear that we are

16 talking about two distinct episodes. And the fact that

17 there is a break in time, that they do involve different

18 victims of the two different episodes means that the two

19 counts that are 88-CRS-56578 and 56581 that occurred at

20 Cameron Woods is one episode, and that the 88-CRS-56577

21 with a different victim at a different location is a

22 separate episode. And for that reason, they should be

23 counted as two different episodes for purpose of

24 924(e).

25      THE COURT: What do you say about the common

1    scheme or plan, Ms. Shappert?

2         MS. SHAPPERT: Your Honor, I cannot dispute that

3    they are very similar, but I would submit that the

4    distinction is that there are two different episodes.

5         THE COURT: Let's assume that there are two

6    different episodes. What is your position if on the

7    night of -- tonight, I am going out and I am going to

8    rob people at this point, that point and that point

9    because I want the jewelry, I know they carry jewelry,

10   so I'm going to all three places tonight, at 9:00

11   o'clock, I'll go there, 9:30, 10:00, o'clock I go to the

12   third place. Is that part of a common scheme or plan,

13   or is that three different robberies for purposes of

14   calculation here? Obviously, it's three different

15   robberies.

16        MS. SHAPPERT: Indeed, and I would submit it's a

17   close call, but I would submit that the law is intended

18   to punish specifics acts. When we have separate acts,

19   they should be punished separately. But I agree, it's a

20   close call.

21        THE COURT: But how does that -- how do I take

22   into consideration that part of the same scheme, plan

23   under the notes commentary?

24        MS. SHAPPERT: Your Honor, with regard to the two

25   at Cameron Woods, I would submit that would be a common

1    scheme.  Going to a separate location is a different

2    scheme.  Very similar factually, but by virtue of the

3    break in time and geography, I would argue to the Court

4    it's not the same scheme.

5         THE COURT:  I, too, think that's a very close

6    call, but I am sort of satisfied from the notes here

7    that I would come down on the side of finding that they

8    were all part of -- on the evidence that I have, that

9    they were all part of the same scheme, and therefore,

10   they should not be separately counted.

11        Anything else, Ms. Rausher, that you have that

12   you wish to present evidence on?

13        MS. RAUSHER:  Your Honor, not regarding the

14   guideline calculation.  The other departure arguments

15   will be from the record.

16        THE COURT:  Yes, that's fine.  It's now 20

17   minutes to 1:00.  What is the -- where's the marshal --

18   what kind of time are you going to need for lunchtime?

19        THE MARSHAL:  I would say about an hour if you

20   can, Your Honor.

21        THE COURT:  All right, we will do that then.  At

22   this point, I do not anticipate changing my tentative

23   findings, Ms. Rausher, Ms. Shappert, on what I have

24   indicated to you thus far.  During lunch, I will review

25   my notes again and go over what you've had to say here

1    this morning and make a determination of where we are on
2    that.

3          Mr. Andresen, can we -- do you have anything that
4    you wish to add in addition to your well-filed motion as
5    to why the matter should be set aside, is there anything
6    that you want to be heard on here in court today on
7    that, or can I make a determination from what you have
8    filed?

9          MR. ANDRESEN:  I think everything is in the
10   motion, Judge.

11         THE COURT:  Do you have anything you wish to be
12   heard on on that?

13         MS. SHAPPERT:  Nothing other than what is already
14   in the record, Your Honor.

15         THE COURT:  I will make the determination of that
16   after lunch.  Let's take a lunch break now until
17   1:45 -- wait just a moment.

18         MS. RAUSHER:  Just briefly, Your Honor.  If Your
19   Honor is going to be reviewing the notes, you will have
20   the transcripts, I very much ask the Court to review the
21   testimony of Purvis Montez, and what he says the total
22   amounts were that he was involved with this group was an
23   ounce and a half, which is a contradiction to some of
24   the things that were said by the government.  I would
25   ask if you would review his testimony.

1      THE COURT:  I will do that.

2      MS. RAUSHER:  Thank you.

3      THE COURT:  I will do that.  All right, let's

4  take a recess until 1:45.

5                  (Lunch recess.)

6      THE COURT:  Let's look at the calculations now on

7  Mr. Dean.  Here is the way I would calculate amounts

8  from the testimony that I find, so you all put this down

9  and let me hear from you.

10     On the Reagan robbery, there was nine ounces, and

11  in addition to the nine ounces, the -- by the way, the

12  nine ounces were supposed to be sold for $7,500 as I

13  recall the testimony, and in addition to the nine

14  ounces, I would find that the two parties, including

15  Mr. Dean, had $2,660 on them for use in purchasing

16  cocaine.

17     Based upon the price that they were to purchase

18  cocaine for, the discussion prices, they could buy

19  slightly more than three ounces of cocaine for $2,600,

20  so that's nine ounces plus three ounces based on the

21  money that they had with them.

22     There were seven ounces from the Abdulla

23  robbery.  The Kentucky Fried Chicken last fling was nine

24  ounces of flex for $8,000 was the sale price.  The flex

25  itself cannot be used to calculate, but since this is a

1  conspiracy as I have said earlier and $8,000 was the

2  price, that money that they saved by conducting a flex

3  operation is the kind of apparatus they use to make

4  money to sell -- to buy and thereby to sell drugs.  So I

5  would attribute the $8,000 that they were getting there

6  to nine ounces of cocaine.

7        There was a robbery that Dean told either Hopper

8  or Massey, I think it was Hopper, about of four ounces

9  from a Mr. Pugh.  That was robbery of two and a half

10  ounces from Mike Crow.  Sabrina Massey cut a quarter of

11  an ounce.  Munoz said that in 1994, he sold for Massey

12  and for Dean.  At some point, Munoz indicates a much

13  larger sale by him, but in cross-examination he

14  indicated that he sold approximately one and a half

15  ounces of cocaine during that year, crack cocaine during

16  that year.  So I have attributed one-half ounce to

17  Mr. Dean of that sale.

18        Now, first of all, Ms. Shappert, what do you take

19  issue with on the items that I find so far?

20        MS. SHAPPERT:  Your Honor, I think there was also

21  testimony -- well, first of all, there were the 2.48

22  grams taken off of Mr. Dean on June 9th of 1994 and the

23  tenth gram off of Mr. Jones, which I would submit were

24  part of this, and then I seem to remember that there

25  were drugs that were obtained from Scotty McKnight.

1          THE COURT:  Well, wait a minute.  Before you
2     leave those gram sizes, I will consider those if it
3     becomes necessary to consider them, but on a gram size,
4     that's not going to make much difference.
5          MS. SHAPPERT:  No, sir, it's not, you are right.
6     I thought there was some testimony with regard to
7     getting drugs from Scotty McKnight.  I'm checking on my
8     notes on that right now, Your Honor.
9          THE COURT:  Who do you think testified to that?
10         MS. SHAPPERT:  I thought it was Massey but I
11    could be wrong.
12         (Pause.)
13         MS. SHAPPERT:  Yes -- excuse me, on Pages 399 to
14    400, Scotty McKnight, I believe Marcus Massey testified
15    that that was a source, a supplier for Mr. Dean.  I
16    don't think it was a large quantity, but I'm going to
17    have the agent check on that, 399.
18         THE COURT:  299?
19         MS. SHAPPERT:  399.
20         MS. RAUSHER:  There is no amounts, Your Honor.
21         THE COURT:  I don't believe there is any way to
22    compute that.
23         MS. SHAPPERT:  Your Honor, you are correct.  With
24    regard to the amounts testified at trial, I would
25    agree.  I would argue some other things, but those are

1    the amounts we have.

2          THE COURT:  Now, what, if anything -- you have no

3    objection to the specific amounts I have found in the

4    specific items that I have found.  Do you have other

5    items that you say should be attributed to Mr. Dean that

6    I have either overlooked or not counted?

7          MS. SHAPPERT:  Your Honor, the trial testimony is

8    not specific with amounts supplied to Mr. Dean by Keith

9    Wallace, Terry Straight, Bobo Slim, Snake Spoola, Tony

10   Brown, Rat Man, Darwin Mobley, Paul Mobley, Puerto Rican

11   E, and perhaps other robberies.  In terms of amounts

12   that were testified at trial, I agree with the Court.

13         THE COURT:  Well, I don't know any way to

14   attribute what amounts those people delivered to

15   Mr. Dean other than testimony that might come in today

16   or sometime, and we don't have it.

17         MS. SHAPPERT:  Yes, sir.  The only other point I

18   would make, and I'm not disagreeing with the Court, is

19   that Mr. Hopper, who was in the conspiracy longer than

20   Mr. Dean, testified that during his five years in the

21   drug business, he sold two and a half kilograms of

22   cocaine base.  And I would submit that when Mr. Dean got

23   into this operation, at least some portion of

24   Mr. Hopper's drugs were reasonably foreseeable to

25   Mr. Dean.  Likewise, the testimony was that Dean,

1  Sampson, Little, Sweat and Hopper all sold on a regular

2  basis in the housing projects, but I cannot point to a

3  specific number with regard to those amounts.

4       THE COURT: Well, I think that is the testimony,

5  but I am not giving any amounts to that testimony

6  because I simply don't know a basis on which to

7  attribute it based on what is before me.

8       MS. SHAPPERT: Yes, sir.

9       THE COURT: Ms. Rausher, other than -- assuming

10 that you would disagree as to the credibility of any of

11 it, and I understand that, but if the Court accepts as

12 credible the testimony in the trial, to which of those

13 specific items do you disagree?

14      MS. RAUSHER: Well, Your Honor, I disagree with

15 the amounts in the Reagan case. Specifically, I would

16 submit to the Court that only eight ounces were, in

17 fact, taken, that even though the testimony was that

18 there were nine ounces, one was returned. Therefore, in

19 fact, there wasn't actually a theft of that ounce and

20 that went back to Mr. Reagan for whatever he said he was

21 going to do with it.

22      I would certainly object to the addition of the

23 three ounces for the $2,600 in money. I would submit to

24 the Court that that $2,600 was all for use of that same

25 incident, and to add anything additional is double

1    counting and not warranted by the record.

2            Regarding the --

3            THE COURT:  For the record, which may lend

4    support to your position ultimately, I would say that I

5    found that that was, in fact, used to perpetuate the

6    robbery, I agree with you on that.  But where we

7    disagree is what do you do with that money after that,

8    when you compare that with the statement that Mr. Dean

9    made.  So you may at the proper court tell them that

10   even this court conceded that that money was flashed or

11   used in perpetuating the robbery.

12           MS. RAUSHER:  Regarding the Abdulla robbery, Your

13   Honor, I would submit that even though there were three

14   witnesses who testified about an alleged incident, there

15   were numerous inconsistencies in the testimony of

16   Mr. Hopper, Mr. Massey and Purvis Montez, and

17   specifically, regarding the firearms that were used, who

18   was in what car, whose idea the robbery was, Marcus

19   Massey says it was his, Purvis Montez says it was Cedric

20   Dean's, who, in fact, did the robbery, Mack Hopper

21   testified that he did it, Marcus Massey said that Cedric

22   Dean did the actual robbery, in fact, who went in what

23   car.

24           If you recall Mr. Montez saying that the Ford

25   Probe was his, and he was disagreeing, he said that it

1    was himself, Mack Hopper and Marcus Massey in the Probe

2    and that Cedric Dean was in the Fiero, when Marcus

3    Massey says that, no, he, Cedric Dean and Purvis were in

4    the Ford Probe and that Hopper was in the Fiero. I'd

5    submit to the Court that when you look at the full

6    circumstances of what transpired that date, and the jury

7    was not asked to make any specific findings about

8    whether, in fact, they believed what happened and that

9    Mr. Dean was involved, when you look at the testimony,

10   it significantly differs and it's inconsistent between

11   those witnesses.

12          And the relationship the three of those witnesses

13   had, that two of them remain in the pods together at the

14   Mecklenburg County Jail, which they admitted to on

15   testimony, that Mr. Montez was Mr. Massey's cousin, I'd

16   submit that when you -- they couldn't even get their

17   stories straight as they attempted put it together, and

18   I submit the Court should not use that seven ounces from

19   that robbery because we didn't hear from Mr. Abdulla, if

20   there, in fact, is one, as to whether, in fact, anything

21   was taken from him.

22          THE COURT: I understand your position, but I

23   would find that there is sufficient evidence on the

24   seven ounces. Anything further?

25          MS. RAUSHER: As to the Kentucky Fried Chicken

```
 1   robbery, Your Honor, I'd submit to the Court and I would
 2   object to using the $8,000 amount and converting it to
 3   nine ounces.  There was no testimony regarding Mr. Dean
 4   other than that he was outside of the Kentucky Fried
 5   Chicken.  Whether, in fact, he, in fact, touched the
 6   money or had anything to do with it or was, in fact, to
 7   receive proceeds from that transaction.
 8              Regarding the Pugh drug amounts, Your Honor --
 9              THE COURT:  Was there some evidence more than
10   that he was just outside the Kentucky Fried Chicken?
11              MS. RAUSHER:  I remember the testimony of Marcus
12   Massey, and there were some differing opinions as to
13   discussions that occurred to prior to going to the
14   Kentucky Fried Chicken and whether, in fact, there were
15   discussions and who was involved in the discussion, et
16   cetera.  But once again, Your Honor, I'd say --
17              THE COURT:  All right.
18              MS. RAUSHER:  Regarding Michael Crow, Your Honor,
19   I'd submit that there isn't any corroborative evidence,
20   there was only one person that testified to that amount
21   and that was Marcus Massey and I'd submit that his
22   testimony isn't credible.
23              And as to Mr. Purvis Montez, I'd submit, Your
24   Honor, that in light of the cross-examination and his
25   testimony on direct and his testimony essentially was
```

1   that he was sort of given these drugs, and it's unclear,

2   he was using it for pocket money or whatever, I would

3   submit to the Court that there is no credible evidence

4   that Mr. Dean, in fact, was involved with that.

5           THE COURT:  Well, I think probably there could be

6   a substantial amount more found from the Montez episode

7   because he was given a small amount of a larger amount

8   that was being sold and dealt in that area, but I think

9   on this evidence I would limit it to that which I have.

10          Therefore, we now have a calculation as I see it

11  of nine ounces plus three ounces, the Reagan episode,

12  seven ounces in the Abdulla robbery, nine ounces

13  attributed to the Kentucky Fried Chicken portion of the

14  conspiracy, four ounces, Pugh robbery, two and a half

15  ounces, Mike Crow, quarter of an ounce, Sabrina Massey,

16  one-half ounce, Montez, which will now get us to a total

17  of what, Ms. Easley?  You all figure this too, please.

18          PROBATION OFFICER:  35 and a quarter ounces.

19          THE COURT:  35 and one-fourth ounces, do you

20  agree with that, Ms. Shappert?

21          MS. SHAPPERT:  We are going to check it with a

22  calculator.

23          MS. RAUSHER:  That's what I come up with.

24          THE COURT:  35, let me see, there are 2.2 pounds

25  in one kilo, and therefore, 32 -- it would take 35

1    ounces to make a kilo?

2            MS. SHAPPERT:  36.

3            THE COURT:  36 to make one kilo, is that

4    correct?  No, that's not right.

5            UNIDENTIFIED SPEAKER:  There is 35.71 ounces per

6    kilogram, I believe, sir.

7            THE COURT:  All right.  So we are talking about

8    here now between half and one and a half kilogram area,

9    is that right, Ms. Easley?

10           PROBATION OFFICER:  Yes, sir.

11           THE COURT:  And what does that do for the

12   calculation?

13           MS. SHAPPERT:  Your Honor, I believe that's base

14   offense level 36 under the guidelines for drug amounts

15   before you talk about the school zone enhancement or any

16   other enhancement.

17           MS. RAUSHER:  That is correct, Your Honor.

18           THE COURT:  36?

19           MS. SHAPPERT:  Yes, sir.

20           THE COURT:  I wish I could find my copy of the

21   presentence report.  Here it is.  It was a 38, it is now

22   a 36.

23           MS. SHAPPERT:  Yes, sir.

24           THE COURT:  So everybody is in agreement with the

25   calculation at this point, whether you agree with the

1    way it's calculated or not?

2             MS. SHAPPERT: Yes, sir.

3             THE COURT: Specific offense characteristic,

4    firearms were routinely possessed. There were any

5    number of people who testified to the use of firearms,

6    including Mr. Hopper, Mr. Massey, Mr. Munoz -- Montez,

7    not Munoz. I don't know whether Mr. Little testified to

8    it or not, but anyway, at least three people -- four

9    people, because Ms. Sabrina Massey testified to it

10   also.

11            So the two-point increase I would find is

12   appropriate. The finding within 1,000 feet, the jury

13   made a special finding of that. There was evidence upon

14   which the jury could make such a finding, and so that's

15   appropriate. That would make an adjusted offense level

16   of 40.

17            MS. RAUSHER: Your Honor, if I could just

18   briefly, just for the record --

19            THE COURT: Yes.

20            MS. RAUSHER: -- regarding the two-point

21   enhancement for the playground enhancement.

22            THE COURT: Yes.

23            MS. RAUSHER: I just want it clear for the

24   record, I'd objected earlier, but at lunchtime in

25   discussing with Mr. Andresen, I am going to object also

1   on the basis that the two-point enhancement, if you
2   recall the count, Mr. Dean was found convicted of 860.
3   I'd submit to the Court that it's double jeopardy to
4   have an enhancement for two points under this section,
5   and he is also looking at double counting for double his
6   supervised release by statute.  So those are other
7   grounds to object to that.

8        THE COURT:  All right, thank you.  Then you go
9   through the -- do you wish to be heard on that,
10  Ms. Shappert?

11       MS. SHAPPERT:  No, Your Honor, I think the
12  guidelines make it clear that the enhancement is
13  appropriate.

14       THE COURT:  Then Paragraphs 26 through several
15  others calculated come to an adjusted total of 33, so
16  Paragraph 36 is an adjusted offense level of 42?

17       PROBATION OFFICER:  That should be now 40.

18       THE COURT:  40.  The adjustment for role in the
19  offense, increase that by three levels for there were at
20  least five people -- six people who were specifically
21  named for whom -- who worked for Mr. Dean.  There were
22  innumerable -- I won't say innumerable, there were other
23  drug addicts who distributed for him, but I find the
24  three-point adjustment for the role is appropriate under
25  3C1.1.  I find no other basis to make a determination of

1    that increase, so he would now be at an offense level of
2    43, is that the way you calculate it?
3              PROBATION OFFICER: Yes.
4              THE COURT: Any objection to that, Mrs. Rausher,
5    that you wish to make?
6              MS. RAUSHER: Other than what I've already
7    stated, Your Honor, no.
8              THE COURT: Ms. Shappert?
9              MS. SHAPPERT: No, sir.
10             THE COURT: Then for purposes of sentencing,
11   Ms. Easley, what are we dealing with here in the
12   calculation?
13             PROBATION OFFICER: That would be a 43 with
14   criminal history category 3. There was one issue in the
15   objections that's not been discussed, but even if you
16   ruled in favor of that objection, it would still be a
17   criminal history category 3.
18             THE COURT: What was that one that wasn't
19   discussed?
20             MS. RAUSHER: Your Honor, it had to do with
21   Paragraph 49, the assessment of one point for criminal
22   history category.
23             THE COURT: Yes.
24             MS. RAUSHER: I would submit that -- the similar
25   argument, that they are related, and therefore, that

1    points shouldn't apply, but it doesn't change criminal
2    history.
3         THE COURT:  Does not, so it doesn't change it.  I
4    would find against that for the record so that the
5    record can be complete in case something else is changed
6    somewhere along the line.  But I would find that it was
7    appropriately calculated, 43.3, which puts your client
8    in a -- is that still mandatory, on the mandatory life,
9    Count 5, five years consecutive, a supervised release of
10   up to ten years on Counts 1 and 4, required ten years on
11   Counts 1 and 4, the other supervised release to run
12   concurrently, a fine of up to 24 million dollars, $200
13   special assessment.
14        Do you agree that -- retaining your disagreement
15   with what the Court has found, do you agree that's what
16   we are dealing with, Ms. Rausher?
17        MS. RAUSHER:  That's correct, Your Honor.
18        THE COURT:  Do you, Ms. Shappert?
19        MS. SHAPPERT:  Yes, sir.
20        THE COURT:  Now, Mr. Andresen, I want to come to
21   you and your client.
22        First of all, on your motion, Mr. Andresen, that
23   the verdict be set aside on the basis that evidence was
24   allowed for the gun which was found, you have made your
25   argument well in your brief, and I believe there was

1    nothing else that you wished to add to that.

2        MR. ANDRESEN: No, Judge, I submit again to the

3    Court that it was the single most damaging piece of

4    evidence.

5        THE COURT: All right. Ms. Shappert, you had

6    nothing further to say on that?

7        MS. SHAPPERT: That's correct, Your Honor.

8        THE COURT: Mr. Andresen, I read your brief which

9    is, as always, well done. It just so happens that we

10   arrive at a different position on that and you might

11   ultimately prevail, but at this point I would have to

12   rule against your position.

13       Now, Mr. Andresen, you have some objections to

14   the presentence report, some of which we have already

15   discussed with Ms. Rausher. First in Paragraph 8, the

16   overall conspiracy has no affect whatsoever as to the

17   calculation as to your client individually, but is there

18   anything else that needs to be discussed in Paragraph 8,

19   Mr. Andresen, your first objection?

20       MR. ANDRESEN: Well, I ask the Court to strike

21   the entire paragraph as it relates to Mr. Sampson. I

22   honestly don't know, it's an area that I guess I feel a

23   bit unsettled about, I don't know the extent to which

24   the Bureau of Prison relies on this sort of information

25   when placing a defendant. I don't know the extent to

1   which a case agent at a prison facility relies on this
2   sort of information when deciding what kind of work
3   programs perhaps or what kind of educational programs
4   perhaps are permitted to a defendant, I don't know.

5          But when the probation officer acknowledges and
6   responds that she did not sit through the trial and did
7   not read the transcript, so when we a conclusory comment
8   at the end that in excess of 19 kilograms of crack
9   cocaine were offered, that's going to be attributed in
10  some measure perhaps to Mr. Sampson when, in fact, the
11  reasonable calculations that we make today may differ
12  substantially from that amount.

13         So it's really because of those uneasy feelings
14  about who may use this information and for what
15  purposes, and how they can adversely affect my client
16  while incarcerated, that I rise to make the objection
17  that I do about it.

18         THE COURT:  You want the whole paragraph
19  stricken, is that what you are saying?

20         MR. ANDRESEN:  Yes, sir, and the response is, the
21  United States probation officer was not present during
22  the trial and did not have access to the trial
23  transcript.  The information presented in the offense
24  was obtained from investigative reports, discussions
25  with case agents, interviews with codefendants and

1    related case reports.

2          THE COURT: Which, of course, is appropriate for

3    the probation officer to do pending -- the probation

4    officer who isn't at trial has got to try to get the

5    transcript and every other thing that they can possibly

6    get, and that's no criticism of the probation office.

7    But I would not object, Mr. Andresen, if it's any help

8    to your client to adding a sentence that the trial

9    evidence did not reveal -- the trial evidence did not

10   show the scope to be as broad as some of the unverified

11   accounts report. I think the government is entitled to

12   its position and you are entitled to your position. And

13   if there was a conspiracy here of many people, whether

14   your client is in it or not, what is the minimum that

15   you think is shown by all of the evidence in this and

16   other --

17         MR. ANDRESEN: If I might defer -- in answering

18   the Court's question, I have, and I will make it to you

19   with a straight face in this case because it's not -- I

20   don't envy the Court in trying to parcel out the wheat

21   from the chaff in the case. We have remarkable

22   testimony I submit to you here, not only internally, but

23   from several different quarters as to what really is

24   real.

25         So, I mean, what I wish to make clear with

1   respect to Paragraph 8 is that this is based on -- this

2   paragraph is based on information that was wholly

3   separate from that which was testified to.

4         THE COURT: Well, I don't believe that there is

5   any indication in here that this was the trial

6   testimony. Suppose that the reports indicate the group

7   was responsible for distribution of somewhere between

8   eight and 19 kilograms, because I think there are at

9   least four people now who have admitted sufficient

10   amount to show eight kilograms, would that be of any

11   help to you? And we may be just jousting in the wind

12   here, Mr. Andresen.

13         MR. ANDRESEN: And I really don't want the Court

14   to spend its time doing that. I just would rest with my

15   objection and my request that it be stricken, and the

16   Court can do as it sees fit.

17         THE COURT: All right, I appreciate that. I will

18   leave it as it is then.

19         MR. ANDRESEN: With respect to Paragraph 11,

20   again midway through, the Court I hope will note that it

21   says, the sentence starts, in 8-94, Ashford was accused

22   of messing up, and it goes on and talks about being

23   beaten up while firearms were pointed at Ashford, Massey

24   continued to beat him. And the testimony at the trial

25   was by Massey that that was one of the things that kind

1    of ticked him off.  When he saw this what he called an
2    affidavit of Ashford that Massey had ordered Hopper and
3    Sampson to draw firearms on Ashford, he got angry, he
4    said, and that wasn't true.  And what the testimony
5    there was, according to Massey, is that he, Massey,
6    committed the assault, he did so with his hand, and
7    there was no testimony that firearms were used, nor that
8    he directed that firearms be used against Ashford.

9         MS. SHAPPERT:  Your Honor, Mr. Andresen is
10   correct, there was no testimony at trial about firearms
11   with regard to that episode.

12        THE COURT:  I agree with that.  You have it in
13   your files another way?

14        MS. SHAPPERT:  Yes, sir, but none of that came
15   out at trial, that's correct.

16        THE COURT:  Well, that has not been -- I'm always
17   at a difficult position here in that if there is an
18   objection, I want to find from the evidence what the
19   presentence report should include.  And if there is no
20   evidence to go on, then I don't really have anything to
21   go on either, and I don't have any evidence that there
22   was a -- such as this going on.  I'm sure that that
23   comes right out of the government files, but there is no
24   evidence that I have before me.  And Mr. Andresen having
25   made an objection to that and the government having not

1    presented any evidence to the contrary, Mrs. Easley, I
2    don't know what y'all do here, but ordinarily what I do
3    is in -- for fear that that may cause somebody some
4    difficulty by showing that there is an assault and
5    really a bad one here, that there is no evidence of
6    before me, I generally take that out of the presentence
7    report.  Is that all right with you?
8              PROBATION OFFICER:  That's fine.
9              THE COURT:  That will be done.
10             MR. ANDRESEN:  Thank you, Judge.  The same goes
11   to the entire Paragraph 14, which is the next
12   objection.  I don't believe there was any testimony at
13   all during the course of the trial with respect to any
14   of these.
15             THE COURT:  I don't recall any evidence of that,
16   Ms. Shappert, do you?
17             MS. SHAPPERT:  No, sir, there was not.  I agree
18   with Mr. Andresen.
19             THE COURT:  That will be taken out.
20             MR. ANDRESEN:  Thank you, Judge.
21             THE COURT:  Next?
22             MR. ANDRESEN:  The next one is 15, Judge, and let
23   me defer that for a second with the Court's indulgence.
24             THE COURT:  All right.
25             MR. ANDRESEN:  Then you get to 20.  The -- I

1   think that clearly the bottom line as it relates to

2   Sampson is going to rest with what the amount of cocaine

3   is that the Court reasonably finds, and as we spent the

4   last -- since 11:00 o'clock this morning or 11:30 this

5   morning on it, and --

6          THE COURT: Let me tell you, then, first of all

7   my preliminary findings so that you can object to them,

8   tell me why it's wrong, or the government can tell me

9   what I haven't included. But as to Mr. Sampson, the

10   evidence from Mr. Hopper was that he sold eight-balls

11   for Mr. Sampson, and he sold -- during 1992, he sold

12   every other day 200 packs, $200 packs, that's 10's and

13   20's. And let me see, was that every day or every other

14   day?

15          MR. ANDRESEN: Well, judge, without -- and I'm

16   sorry for jumping in, but that's precisely where we are

17   headed with this entire four-volume transcript.

18          THE COURT: Well, that's why I want to tell you

19   where I am so you can bring to my attention whatever you

20   want to, but this is my notes.

21          MR. ANDRESEN: That's right, and you have made

22   some wonderful notes and have a very good recollection

23   of this trial, and I'm -- a defendant can't ask for more

24   than that. But in this case, the testimony that Mack

25   Hopper provided was that he -- he gave -- eight-balls,

1    as the Court has -- this is on Page 58 of the

2    transcript. Do have you the transcript with you,

3    Judge?

4         THE COURT:  I do, I will look at it here, 58.

5    Yes, sir.

6         MR. ANDRESEN:  Starts out on Line 11, when he was

7    asked, how long have you known Eric Sampson,

8    approximately all my life, Line 11, between the

9    years '92 and February of this year, '95.  It went on to

10   say that -- the question was, did you have occasion to

11   be associated with Eric Sampson in the business of

12   distributing cocaine and crack cocaine?  Yes, ma'am.

13   Well, that's through February of '95.  Well, he was

14   incarcerated, I believe it was January 9 of 1995.  And

15   that may seem like a small point, but the problem is the

16   Court has to make a credibility as to how -- as you

17   started this hearing, you said, I have got to find from

18   the credible evidence what the amounts were that are

19   reasonably foreseeable to these defendants.  And it

20   becomes awkward and difficult to find what credible

21   evidence is.

22        I realize there was a conviction here, but as we

23   now narrow in on the specific issue of how much is

24   reasonably foreseeable, when a man starts out and says,

25   oh, yeah, I've been dealing through February of '95, and

1    we know that my client was incarcerated in January,

2    that, I submit to the Court, presents a credibility

3    issue.

4           THE COURT:  Well, that to me is not a heavy

5    credibility issue because we are going from 1992 to

6    1995, and the only portion that is taken out of that is

7    sometime from the middle of January to sometime in

8    February.  But I, too, tried to disregard that in my

9    notes and went to what I now see is on Page 59.

10          MR. ANDRESEN:  Eight-ball, I submit to the Court,

11   and the Court I would hope would take it from the number

12   of drug cases you have, are not the same as 20's.  And

13   the problem gets further complicated with Mr. Hopper's

14   testimony because at first he starts out by saying, I

15   got eight-balls, and now he switches over to 20's.

16          THE COURT:  Tell me your distinction between

17   eight-balls and 20's here.

18          MR. ANDRESEN:  Okay.  An eight-ball as I

19   understand it is 3.5 grams.

20          THE COURT:  Right.

21          MR. ANDRESEN:  A 20 as I understand it is

22   two-tenths of a gram.

23          THE COURT:  And what is a $200 pack?

24          MR. ANDRESEN:  Two ounces.

25          THE COURT:  Two ounces?

```
1              MR. ANDRESEN:  Excuse me, two grams.

2              THE COURT:  Two grams?

3              MR. ANDRESEN:  Two grams.

4              THE COURT:  So when he talks about 200's, what is

5    he talking about?

6              MR. ANDRESEN:  He's talking about two grams.

7              THE COURT:  Two grams, all right.  Two grams --

8              MR. ANDRESEN:  When he is talking about $200

9    worth of 20's, that's right.

10             THE COURT:  $200 worth of 20's.

11             MR. ANDRESEN:  Then what he has in his packet,

12   according to this testimony here, he has got ten little

13   baggies each of which has .2 grams that are -- each of

14   which sells for $20.  That's what this testimony, this

15   portion of his testimony relates to.

16             THE COURT:  Okay, it's two grams in the 200's is

17   what you are saying?

18             MR. ANDRESEN:  That's correct.

19             THE COURT:  Government?

20             MS. SHAPPERT:  Your Honor, I would agree.  The

21   only point I would make about my outline, there is a

22   mistake.  Mr. Hopper says he was getting it every other

23   day, not every day on Pages 59 through 60, and I would

24   submit that it's not inconsistent for him to get a group

25   of eight-balls and proceed to sell 20's.  But mainly his
```

1    testimony was in 1992, he was selling every other day a
2    200 pack.

3        THE COURT:  Right.

4        MS. SHAPPERT:  And that would be -- I think with
5    regard to that portion of his testimony, that is a
6    conservative number, I think that's fair to the
7    defendant, because at other points he talks about other
8    amounts, but that was for 1992.

9        THE COURT:  Well, I have disregarded '93, '94 and
10   some part of 1995 in my tentative calculation,
11   Mr. Andresen, for that very reason.  But when it got
12   more specific as to '92, I think he was very specific on
13   that.  So for 1992, my calculation was two grams per day
14   for 175 days, two grams every other day for a year.
15   That's the way I arrived at it.

16       MR. ANDRESEN:  I mean, and clearly there is
17   testimony, whether it's credible or not is obviously the
18   issue, but there is testimony that goes to support that
19   calculation, yes.

20       THE COURT:  Now, moving to the next item that I
21   would find would be, I went -- this is Puff's testimony,
22   Mack Hopper, went to New York with Sampson several times
23   and got three, four, five ounces of crack.  I would make
24   the finding based on what I have before me that three
25   times he went to New York and got three ounces a time.

1  I think probably what I'll do here is, Mr. Andresen,
2  after we get through with the whole thing, I will still
3  give you an opportunity to object, but if you have any
4  immediate objection, do so. But Ms. Shappert, rather
5  than waiting and coming back to you later on, if you
6  have an immediate objection, you may feel free to
7  object, too.

8      Then it says, Sampson and I robbed on Freedom
9  Boulevard, Freedom something, and we got eight ounces.
10 And then --

11     MR. ANDRESEN: May it please the Court.

12     THE COURT: Yes.

13     MR. ANDRESEN: I believe what he said was that
14 Sampson was not present during that robbery.

15     MS. SHAPPERT: I believe the testimony was that
16 Sampson set up the robbery, and it's around Page 85, so
17 that would be reasonably foreseeable even if Sampson
18 were not the one who pulled the gun.

19     MR. ANDRESEN: His testimony was that he and
20 another person, Sweat, went over to do that, over to
21 that location.

22     MS. SHAPPERT: Page 85, it says, question, and
23 when did the robbery at the other car wash occur
24 approximately? Answer, 1984. Question, who was
25 involved in that robbery? Me and Mr. Sampson.

1    Question, was that Eric Sampson?  Yes, ma'am.  And he

2    also goes on to say that it was -- on Page 86 midway

3    through around Line 10, he says, so Mr. Sampson asked me

4    would I go on and do this for the eight ounces of crack

5    cocaine.  So I would submit that it is reasonably

6    foreseeable to Eric Sampson.

7         THE COURT:  What do you say, Mr. Andresen?

8         MR. ANDRESEN:  Well, then down on Line 14, did

9    Mr. Sampson go with you to Freedom Drive?  And, no,

10   ma'am, he didn't.  Why not?  Because I was supposed to

11   meet the boy alone.  And then what he talks about is

12   that, we sold the crack, and --

13        THE COURT:  I think that's -- even from my notes,

14   I have that Sampson was not there but that he did plan

15   it and that they sold it after it was taken.  I don't

16   think he has to be there to have it attributed to him.

17        MR. ANDRESEN:  I don't either necessarily, Judge.

18   I think, however, when dealing with a witness where the

19   government's own agent said that, he told us something

20   different, and where his credibility is so impeached

21   that way, the Court has to look at testimony like this,

22   I submit, with a heightened sense of care rather than to

23   simply accept what he is saying.  An agent got on the

24   stand and said, Mack Hopper didn't tell me -- that's not

25   what he told me.  With respect to the trips, by the way,

1    to New Jersey, New York, Agent Modcelewski said, that's

2    not what he told me.

3         THE COURT:  Are you saying he said six ounces?

4         MR. ANDRESEN:  No, no, it was different time

5    frame, different -- the time frame was different, I

6    believe, was the testimony from the agent, supposedly

7    1994 or was '92 or something of that nature, but -- and

8    we can pull the stuff out if you'd like, but --

9         THE COURT:  I'm giving you my findings and you

10   are free to give me whatever you wish after that, but

11   that's what I would find from the Freedom Boulevard.

12        D Dog, Darwin Mobley sold Sampson and me two or

13   three times ounces of crack cocaine.  Sampson shorted

14   Mobley after ordering three ounces, and Mobley fronted

15   Sampson and me one to one and a half ounces.  I find

16   that total transaction, the first transaction being two

17   ounces and the last transaction being one ounce, for

18   three ounces.  Then Sampson helped retrieve the Massey

19   drugs consisting of four ounces -- I don't know what

20   I've done with the rest of my notes -- one trip to New

21   York, the driver had 82 grams on his person.

22        MS. SHAPPERT:  Of powder, yes, sir.  Yes, Your

23   Honor, that was Hopper, and it was powder.

24        THE COURT:  Powder, okay.

25        MS. SHAPPERT:  That was the fourth trip, and

1  Mr. Hopper was apprehended in Virginia.

2  THE COURT: That's right, okay. So there are 82

3  grams that he was -- had on his possession in that

4  fourth trip. The robbery at Pep Boys was three ounces.

5  The robbery of Abdulla, that didn't involve your

6  client.

7  What additionally do you say, Ms. Shappert?

8  MS. SHAPPERT: Your Honor, there are a couple I

9  would say. One would be the August 20 traffic stop near

10  Southside Homes which was 5.17 grams of crack found in

11  his crotch area.

12  THE COURT: I will get that one if five grams

13  becomes -- I've tried to get those which may add up.

14  MS. SHAPPERT: I would also submit, Your Honor,

15  Pages 656 through 657 when Charles Snake talks about

16  selling Spoola's crack, Thomas Brown's crack to Sampson,

17  Snake said that in 1992, Snake sold to Sampson

18  approximately four times a weeks, up to two times a day,

19  Snake sold Sampson eight-balls, quarters and a half, and

20  ounces of crack were fronted to Eric Sampson only with

21  Spoola's permission. When asked the amount, Snake said

22  from the winter of '91 through the winter of '92, Snake

23  and Spoola sold Eric Sampson $2,000 worth of crack

24  cocaine a week, that's on Page 658, and that would be --

25  THE COURT: 658?

1          MS. SHAPPERT:  That would be conservatively one

2     and a half ounces of crack cocaine a week for 52 weeks,

3     and that would be 78 ounces of crack.  Again, that's

4     Page, around 656 through 658, that would be 78 ounces.

5     And finally, when the Court is ready, also we would note

6     Pages 732 through 733, the testimony of Eddie Little,

7     that Little saw Eric Sampson buy an ounce from Kent

8     Wallace and saw Eric Sampson buy different amounts up to

9     an ounce from Paul Mobley.  So I would submit an ounce

10    from Kent Wallace, and being conservative, an ounce from

11    Paul Mobley.

12          THE COURT:  730?

13          MS. SHAPPERT:  Yes, that -- that would be 732 to

14    733 was the discussion of buying an ounce from Kent

15    Wallace and up to an ounce from Paul Mobley.

16          THE COURT:  I would attentively find one ounce

17    from Kent Wallace.  Didn't I already count something

18    from Mobley?

19          MS. SHAPPERT:  No, sir, you counted with Darwin

20    Mobley, but this is Paul Mobley.

21          THE COURT:  Paul Mobley, sure is.

22          MS. SHAPPERT:  It's a different Mobley.

23          THE COURT:  Yes.

24          THE COURT:  And finally, Your Honor, if I could

25    argue very briefly, I would submit that eight ounces of

1    crack from the Damon Reagan episode would be reasonably
2    foreseeable to Mr. Sampson because I believe the
3    testimony from Mr. Hopper was they were out there
4    looking for eight ounces. They only found four, but if
5    he knew about at least eight, those eight would be
6    reasonably foreseeable to Mr. Sampson.

7        THE COURT: So if I want to find a kilo of
8    cocaine because I've heard it's out there, and I go out
9    and contact everybody I can find and I'm only able to
10   get a half-kilo, I am chargeable with a whole kilo?

11       MS. SHAPPERT: Your Honor, if you are a member of
12   a conspiracy, and, in fact, there is evidence that there
13   is a whole kilo that did exist, yes, sir, I would say
14   that is true. If it were just a fanciful notion of
15   someone that it might be out there, I would say not.
16   But in this case, I would submit it's quite clear that
17   there is significant evidence that there were nine
18   ounces and eight ounces actually seized, they were out
19   there looking for eight ounces in two packages was the
20   testimony at trial.

21       THE COURT: I would certainly agree with that,
22   that they had probably every reason to believe that if
23   they looked carefully, they could find eight ounces at
24   least of cocaine out there. But I have -- and I don't
25   have any problem with that on the conspiracy basis

1  charge under 846, but on calculation of his

2  participation, I have some difficulty charging him.

3      So if I decide -- if you and I decide we want to

4  see if we can't sell 50 kilos and retire but we can only

5  find one kilo, then we are chargeable for calculation

6  purposes of 50 kilos?

7      MS. SHAPPERT:  No, sir, and I wouldn't contend

8  that.  It's like when somebody makes a representation, I

9  will sell you 20 kilos, for determining the amount of

10 drugs reasonably foreseeable, the Court needs to look at

11 what was realistic for that person to be able to front

12 or to obtain.  So just because someone says 20 or 50

13 kilos does not make it reasonably foreseeable.

14     In this episode, however, we know there were

15 eight ounces, we just only found four.  And again, I

16 would reiterate that the 78 ounces from the Snake Spoola

17 transaction would be foreseeable to Mr. Sampson.

18     THE COURT:  That was on Page 530 something?

19     MS. SHAPPERT:  That would be on Pages 656 through

20 658.

21     THE COURT:  Mr. Andresen, what say you to the

22 chargeable as foreseeable of the eight ounces or nine

23 ounces and finding four?  I've at this point tentatively

24 found four as to your client.

25     MR. ANDRESEN:  As a first instance, you have got

1    to accept Marcus Massey's testimony.

2         THE COURT:  Okay.

3         MR. ANDRESEN:  Secondly, you've got to -- I

4    believe that the testimony that my client drove but did

5    not search, and I think that Massey further says that

6    what Sampson received was an ounce -- quarter of an

7    ounce.  The testimony is that my client drove, but

8    there's no evidence that he was searching for any drugs.

9         THE COURT:  Oh, I would find that there is

10   evidence that these two went to look for it with

11   Mr. Massey, didn't they?

12        MR. ANDRESEN:  Massey is the one testifying,

13   Judge.

14        THE COURT:  Yes.

15        THE COURT:  But looking for it, what do you say

16   to that?  Ms. Shappert says you are accountable for the

17   eight or nine ounces if that's what you are looking for

18   in the conspiracy, and that's what the conspiracy is,

19   trying to get the drugs.

20        MR. ANDRESEN:  Well, I don't know that there was

21   any testimony as to how much drugs they were -- that my

22   client knew they were about looking for, if, in fact,

23   Mr. Massey's testimony is to be believed.  The

24   recollection I have got of the testimony is that Massey

25   says, we ripped it off, I threw it out of the car, when

```
 1    I got back, I asked Sampson to drive us over there, he
 2    drove us over there, Hopper and I went outside --
 3         THE COURT:  Too fast, we have got to get this
 4    down.  I'm sure Scott can do it, but not too fast.  Go
 5    ahead.
 6         MR. ANDRESEN:  Do you want me to repeat that?
 7         THE COURT:  No.
 8         MR. ANDRESEN:  So that's what the testimony was.
 9         THE COURT:  Ms. Shappert?
10         MS. SHAPPERT:  Your Honor, page 93, this is the
11    direct examination of Mr. Hopper, what, if anything, did
12    Mr. Massey want you to do?  Answer, Mr. Massey, okay,
13    while Mr. Massey was in jail, he called and told me and
14    Mr. Sampson that before they got pulled over by the
15    police, he had tossed eight ounces of crack cocaine and
16    the .38 pistol out of the window and he would like for
17    us to go retrieve that for him.  And then the question,
18    did you meet up with Marcus Massey and Eric Sampson?
19    Answer, it was like when Marcus got out of jail, me and
20    Mr. Sampson went to go retrieve it, but we couldn't find
21    it.  So when Marcus got out of jail, he took us to it,
22    that's when we found it.
23         MR. ANDRESEN:  At 279, Judge.
24         THE COURT:  279.
25         MR. ANDRESEN:  Testimony of Marcus Massey.  What
```

1  he says is, I told them I would look out for them as far
2  as -- this is at Line 6, 7 -- as far as we would go over
3  there. Before I threw the drugs out of the car, the
4  crack cocaine out of the car, I wanted him to take -- to
5  go with me over there with Mack Hopper to help me find
6  the drugs and the gun.

7      Did you, Mack Hopper and Mr. Sampson go to the
8  neighborhood where Damon Reagan lived? No. Where did
9  you go? Beatties Ford Road. Whose car did you take
10 over there? My car. I had Eric drive. Me and Mack
11 Hopper got out on the side where I threw the drugs out.
12 He was riding up and down --

13     THE COURT: That's dealing with the time after he
14 got out of custody. The evidence was, I thought, that
15 while he was in custody, he notified Hopper and your
16 client that he had thrown the eight ounces out and a
17 gun.

18     MR. ANDRESEN: On 280 at Line 4, he says, and I
19 remember that yellow plastic bag, that before me and
20 Cedric Dean divided the dope up, crack up, he had four
21 ounces and I had four ounces, and when I threw it out
22 the window, I still had four ounces in the yellow bag.
23 I mean, what they are going back to look for as I
24 understand it was four ounces.

25     MS. SHAPPERT: It goes on, Your Honor, what

1    credibility argument which you and Ms. Rausher never

2    waive, but beyond that, what say you to that testimony

3    on -- specifically on 657?  I overlooked that.

4         MR. ANDRESEN:  Yes, it's -- 657, Judge?

5         THE COURT:  Yes, beginning at Line 3, back in

6    1992, how often were you selling crack cocaine to Eric

7    Sampson?

8         MR. ANDRESEN:  Right, and --

9         THE COURT:  Anywhere from four times a week,

10   twice a day.  What quantities?  Eight-balls, quarters

11   and half.

12        MR. ANDRESEN:  Right, and we submit that that is

13   in conflict with what is on 658 where he says -- when

14   asked how much, he said $2,000 a week.  And based on

15   other testimony, it's -- you just can't buy half-ounces,

16   for example, twice a day, four times a week for $2,000.

17   I think what Ms. Shappert, in fairness to her, though,

18   it says to the Court, well, let's just take at what

19   Mr. Guy's testimony is, which is an ounce is $1,250 or

20   $1,300, this equates out to about an ounce and a half a

21   week for the entire year of '92.  Guy -- at a minimum,

22   let me submit to the Court that Guy was -- testified to

23   being robbed in November, on November 20th of '92.  I

24   don't believe there was any other drug transactions

25   between them after November 20th, so to the extent that

1    happened to the other four ounces that was for Cedric?

2    Answer, by it being out of the bag when I threw it out,

3    it spread out.  It had been raining that week while we

4    were in jail, while we and Cedric was in jail, so when I

5    got out, I couldn't find it.  So clearly, they threw all

6    eight ounces out of the car.

7         THE COURT:  Okay, I am satisfied with the

8    evidence that there was eight ounces that was thrown

9    out.  I am reasonably satisfied by the greater weight of

10   the evidence that Mr. Massey told Mr. Hopper and your

11   client that there was eight ounces out there and that

12   your client went there to help them, knowing that they

13   were looking for eight ounces.  But I am also finding

14   that they only found four ounces and that four ounces is

15   to be attributed to your client out of that deal and not

16   eight.

17        All right, what else, Ms. Shappert?

18        MS. SHAPPERT:  Your Honor, I would simply

19   reiterate the 78 ounces on the Snake Spoola episode,

20   which is on Pages 656 through 658.

21        THE COURT:  Let me look at that.  I continually

22   overlooked that one and I will look at it right now, 656

23   through 58.

24        MS. SHAPPERT:  Yes, particularly 658.

25        THE COURT:  Mr. Andresen, we always have the

1    that has any effect on the calculations, that's roughly
2    six weeks perhaps --
3         THE COURT:  Just a minute, Ms. Shappert, I will
4    get to you in a minute.
5         MR. ANDRESEN:  Roughly six weeks in '92 that
6    should not be counted.
7         THE COURT:  All right.
8         MS. SHAPPERT:  Your Honor, I think the testimony
9    was that the Marcus Massey robbery of Snake, and it's
10   referred to on Pages 660 and 665, was done by Massey and
11   it was after Snake and Spoola realized that Massey had
12   done this that they stopped dealing with Sampson.  He
13   said they dealt with Sampson through '92, and when they
14   became aware at the end of November that Massey was
15   behind the robbery, and that happened to be -- Sampson
16   was Spoola's next-door neighbor, that is when they
17   stopped having any business relationship.
18        THE COURT:  All right.  My findings would be that
19   probably amounts are closer to accurate in recollections
20   than -- that is, monetary amounts are closer than
21   specific gram, ounce, pound or kilo amounts are because
22   it's very hard to add up, first of all, how much in the
23   way of grams was sold.
24        I do find that Mr. Guy's testimony is credible to
25   the extent that he was certainly telling to Mr. Sampson,

1    and I think it could easily be found that he was selling

2    a little over $2,000 per week for the year of 1992. But

3    in order to make sure under this evidence that it is not

4    overstated based upon the evidence, I'm going to find

5    that one ounce per week for 45 weeks.

6              Anything else, Ms. Shappert?

7              MS. SHAPPERT: No, sir.

8              THE COURT: Mr. Andresen, it's with you, do you

9    have anything else?

10             MS. SHAPPERT: Did you include Paul Mobley and

11   Keith Wallace?

12             THE COURT: I did include that.

13             MS. SHAPPERT: Thank you, sir.

14             MR. ANDRESEN: No, Judge.

15             THE COURT: Ms. Easley, have you kept score?

16             PROBATION OFFICER: I have been trying to keep

17   up.

18             THE COURT: All right. Now, what -- go ahead.

19             PROBATION OFFICER: I need some assistance with

20   82 grams of powder, how that would convert to crack.

21             THE COURT: My recollection is that powder

22   generally converts to about 85 percent, but I stand

23   corrected by either one or both of you all. Do you have

24   a correction?

25             MS. SHAPPERT: That would be about right.

```
 1                    THE COURT:  Mr. Andresen?

 2                    MR. ANDRESEN:  Truthfully, Judge, I don't know.

 3                    THE COURT:  I thought what she was talking about

 4      was 85 grams of powder converted to crack.  I don't

 5      believe there is any equivalency table on that, is

 6      there?

 7                    MS. SHAPPERT:  No, Your Honor.  I think that it

 8      was 82 grams, and I think that depending on how you cook

 9      it, and the testimony was there was a cooker for

10      Mr. Sampson, you get back about 85 percent of those 82

11      grams.  I think that would be fair.  Some people can get

12      more than that, usually it's somewhat less.

13                    THE COURT:  Let's say 75 percent, three-fourths

14      of 82 grams, which would be about 61 and a half grams.

15                    MS. SHAPPERT:  That's right.

16                    THE COURT:  Ladies and gentlemen, those of you

17      seated in the audience out there may wonder what in the

18      world is the Court doing sitting around here talking

19      about 65 times 75 percent and all of that sort of thing

20      and where does that get you and what are we doing this

21      for.  First of all, I want to tell you that my guess is

22      that most of you are here in support of one or the other

23      of the defendants who are to be sentenced here today.

24                    I also want to tell you while you have sat there

25      this time, I believe I may have said something during
```

1    the trial, but I want you to know that this is a

2    laborious thing for the defendants to go through, for

3    lawyers to go through and for the Court to go through.

4    So I know this is laborious for you to sit there and

5    listen to all of these things that are being done.

6    That's a long way about saying that whether you and I

7    agree with what is done here today is reserved for you

8    to decide and you may feel whatever way you wish, but I

9    do want to thank you for the patience and the quietness

10   with which you have sat here today.

11          You've been a very attentive audience, an

12   audience that obviously cares and is interested in what

13   is going on, and I thank you for that.  Your quietness

14   and your behavior have enabled us, even though it seems

15   like a long time, to move along a lot faster than

16   sometimes we could have, so I thank you, the audience,

17   for your participation.

18          PROBATION OFFICER:  It would be just over two

19   kilos.  So if it's just over, based on those cases --

20          THE COURT:  So if it's just over, I will make a

21   finding of 1.5 kilograms, perhaps slightly over two, but

22   close to two kilograms of crack cocaine.  Now,

23   Mr. Andresen, that then would put the level at 38, is

24   that right?

25          PROBATION OFFICER:  Yes, sir.

1        THE COURT:  Level 38, two-level increase because
2    of possession of firearms during the conspiracy.  Do you
3    wish to be heard on that?

4        MR. ANDRESEN:  Same argument that Ms. Rausher
5    made before, that a lot of this obviously depends on the
6    credibility.

7        THE COURT:  It does.  The three-level adjustment
8    for the supervisory position, management position that
9    your client was in.  I understand, of course, that he
10   was -- from your position, he wasn't even involved in
11   it, I understand that, but there is some evidence that
12   he was a supervisor.

13       MR. ANDRESEN:  Yes, and on that score I find it
14   incredible that Massey, even in the context of a plea
15   agreement, could receive a two-level enhancement because
16   he was the manager, that he could testify that the same
17   people that Cedric Dean had working for him were the
18   same people that Eric Sampson had working for him, and
19   by the way, they were the same people that work for me,
20   I believe was Massey's testimony, that somehow, despite
21   being a fellow who is the government's own witnesses,
22   say was deceptive, has the reputation for being so, and
23   whose credibility was challenged even I submit by
24   testimony from the case agent, that we could accept his
25   testimony with respect to -- and that's all there is,

1   with the naked testimony, with respect to my client

2   being manager or supervisor and for him to receive a

3   higher enhancement than he, himself received.

4         THE COURT:  Ms. Shappert?

5         MS. SHAPPERT:  If I could respond, we had a

6   number of people who testified about Eric Sampson as the

7   manager.  According to Hopper on Page 59, Sampson would

8   front to Hopper, and on Page 120, Hopper said he was

9   slinging for Sampson.  Hopper also told us that Doll and

10  Joanne allowed Sampson to use their homes for drug

11  distribution in exchange for crack.  Mr. Hopper said

12  that Tony Moore was Sampson's cooker for crack cocaine,

13  and Mr. Hopper testified that Alvin Paul, who is

14  deceased, distributed packs of crack cocaine for

15  Sampson.

16        With regard to Marcus Massey, he did say that it

17  was Mr. James, J.C. Jeter, Ms. Georgia Jeter, Joanne

18  Davis, Shirley Ann and May Moore who worked for Marcus

19  Massey.  That was on Page 261.  On Page 299, he said

20  Keith Ellis Ashford conducted sales for the conspiracy

21  with walkie-talkies.  On Page 443, Sabrina Massey

22  allowed Sampson to put a beeper in her name, so I would

23  submit that is some sort of managerial role over

24  Ms. Massey.  And she also testified herself that she

25  obtained a pager for Sampson, put it in her name and

1   Sampson paid the bill.  Eddie Little testified that he

2   sold drugs for Sampson on Page 730, and Eddie Little

3   also verified that Tony Moore was Sampson's cooker.  And

4   when asked, Eddie Little said other people who worked

5   for Eric Sampson included Hopper, Mario Richardson and

6   Rodney Funderburk.

7        THE COURT:  I believe I mentioned this morning

8   the names of people who perhaps worked for Mr. Sampson

9   when I was referring to Mr. Dean earlier, and

10   Ms. Rausher correctly called that to my attention that

11   that was Mr. Sampson, not Mr. Dean that I was referring

12   to.  In addition, there were these other names that were

13   given by Mr. Little and Ms. Massey, Sabrina Massey.

14        I do have some -- sentencing guidelines is always

15   a problem, but it is always difficult for me in

16   sentencing guidelines when I reach the point where

17   people who are at least as involved or more involved are

18   going to end up with more time than those who are more

19   heavily involved.  The truth of the matter is, that's a

20   matter that is before sentencing guidelines right now.

21   I don't know where it will get, but I do know there is

22   an advisory committee which has indicated to the

23   sentencing guidelines that there ought to be a latitude

24   so that a sentencing court, even in spite of having to

25   make the findings that it does, could in the final

1    analysis look at the overall conspiracy to ensure that
2    inequities are not happening. I don't know why
3    Mr. Massey did not get the three-level but got a
4    two-level, but I can only go on what I find the evidence
5    as to Mr. Massey -- Mr. Dean and Mr. Sampson showed, and
6    it is not evidence that Mr. Massey got only a two-level
7    increase.

8         So, Mr. Andresen, I understand what you have said
9    by that, but I do count at least, I think, nine people
10   who were -- and certainly there were at least seven, I
11   believe there were nine, who were shown to have been
12   working for your client and for whom he was manager or
13   controller. So I would have to find that a three-level
14   increase is appropriate.

15        The jury found that the events took place within
16   1,000 feet of the playground or schools, and I think
17   there was evidence to support that.

18        MR. ANDRESEN: May I be heard on that just a
19   second?

20        THE COURT: Yes, sir, you may.

21        MR. ANDRESEN: The -- and I understand the
22   temptation to rush past that. We had a discussion about
23   that, as the Court will recall, because of the nature of
24   the specific charge in this case in that it was not
25   simply allegations of 841 constituting 846, sentencing

1    enhanced under 860, and that we submitted was a classic
2    matrix was not filed in this case in the charging
3    document, instead it was, what we submitted, was an 860
4    conspiracy.

5        There is under 860, which is a penalty enhancing
6    provision, the very real fact we submit to you, as
7    Ms. Rausher just said a moment ago, that the Court will
8    have to impose twice the supervised release term because
9    of this charge. Now, this charge means in this case an
10   860 conspiracy, a conspiracy to sell drugs within 1,000
11   feet of a protected area, that's what the charge was
12   here. To add an additional two levels we submit does
13   run afoul of the double jeopardy clause, and so we ask
14   that the Court not impose that level for that reason.

15       MS. SHAPPERT: Your Honor, I would simply cite to
16   the guidelines Section 2D1.2, which calls for a
17   two-level increase when there are drugs involving a
18   protected location, and the jury clearly found beyond a
19   reasonable doubt that that was true in this case.

20       THE COURT: What do you say the conspiracy was in
21   this case?

22       MS. SHAPPERT: The conspiracy was a -- it was a
23   bifurcated conspiracy. It was a conspiracy to violate
24   21 U.S.C. 841 with regard to crack, and it was a
25   conspiracy to do that within 1,000 feet of a school or a

1  playground, which is why in order to prevent any

2  problems with regard to multipurpose conspiracy, we did

3  request a special verdict. And the jury found that that

4  860 enhancement did apply.

5  MR. ANDRESEN: And, see, that has been the

6  frustrating aspect of this particular conspiracy is that

7  it's been really several, and obviously, these may be

8  issues for the Court of Appeals, but the conspiracy as

9  charged was to distribute drugs within 1,000 feet of the

10  playground or protected area. Then we got into the flex

11  concepts of supporting -- as part of the conspiracy in

12  this matter. Then there were the robberies which were

13  allegedly part of the conspiracy of this matter.

14  So it really took on a different form depending

15  on which witness we were talking about, and I submit

16  really go to the Court's finding as to quantities as it

17  relates to this conspiracy, because there was only one

18  count in this case. But what we've aggregated on this,

19  for example, the Charles Guy issues and all of that,

20  yes, it fell within the time frame of the alleged

21  conspiracy, but not at -- there was no evidence to link

22  up any of those drugs with what -- regardless of what

23  form of the conspiracy the government wishes to take on,

24  whether it was within the protected area or whether it

25  had something to do with flexing or whether it had

1  something to do with robbery, there is really no
2  evidence to link up any of that Guy testimony to drugs
3  sold within the context of a conspiracy.

4        And that's been the difficulty here, we've had a
5  series of individual actions which the government now
6  throws into some very chameleon type of charge, and we
7  come today then and the Court is simply aggregating all
8  of this and saying, well, it must be part of what he was
9  convicted of and as a result, we get to a .38, and we
10 submit that's not proper.

11       THE COURT: All right, I will find that the
12 two-point assessment is appropriate. That puts us at a
13 level 45, Ms. Easley?

14       PROBATION OFFICER: Yes, Your Honor.

15       THE COURT: At a level 45. Do you wish to be
16 heard now on your motion, Mr. Andresen, about prior
17 convictions?

18       MR. ANDRESEN: Well, Judge, the probation officer
19 has found that Mr. Sampson is a career offender based on
20 two convictions that he has, both of which were, or are
21 assaults on female, one dating back to '90, one dating
22 back to '93. We -- on his behalf, I filed a motion for
23 appropriate relief in State Court as it relates to the
24 1993 conviction on the basis that the documentation with
25 respect to that conviction showed as follows:  He

1    appeared in March of '93, waived court-appointed counsel

2    but did not waive retained counsel, appeared about six

3    weeks later at trial without counsel, was tried in front

4    of Judge Boner, found guilty and sentenced.

5    THE COURT: I have your motion, including all of

6    that.

7    MR. ANDRESEN: And that argument was heard in

8    front of a judge who does primarily juvenile cases,

9    Judge Jones, who denied our motion. And that matter has

10    not been taken up on appeal for -- that matter is ripe

11    to be taken up on appeal, it has not yet been taken up

12    on appeal.

13    So with respect to those two findings, I submit

14    to you, given the status of the case law, it's probably

15    a technically accurate finding, but I would wish to be

16    heard later with respect to whether it overstates the

17    criminal --

18    THE COURT: Let me ask Ms. Shappert at this

19    point -- you may have a seat, Mr. Andresen.

20    MR. ANDRESEN: Thank you.

21    THE COURT: Ms. Shappert, I don't have any

22    problem finding that that -- there are -- those

23    convictions are recorded and they are properly accounted

24    for at this point. My only concern is, and I don't want

25    to get into the business of retrying state cases, but

1    there is a flag over this one that would indicate at

2    least to some extent that it may be an overstatement of

3    the seriousness of the matter. What is your position?

4         MS. SHAPPERT: Your Honor, a couple things.

5    First of all, I would cite to the Court the case of Park

6    versus Raley, which is United States Supreme Court 121,

7    Lawyers Edition Second 391, it's a 1992 case which

8    upheld the presumption of regularity which attaches to

9    prior convictions Once the state proves there is a prior

10   conviction, notwithstanding any written transcribed

11   record.

12        THE COURT: I've already found that to be the

13   case.

14        MS. SHAPPERT: I would also cite to the Court the

15   test which the Fourth Circuit has provided for reviewing

16   collateral challenges to convictions, which is what we

17   have here, that being United States versus Bradshaw, the

18   Fourth Circuit, which is 999 F.2d 798, cites to the

19   Custis test, and I'll be glad to tender it to the

20   Court. And I would finally note, and I'm sure the Court

21   is aware of this, that the Fourth Circuit has expressly

22   recognized that assault on a female, being a two-year

23   North Carolina misdemeanor, is a felony for purposes of

24   career offender. I will just tender these to the

25   Court.

1    And I would submit that we can presume the
2  regularity conviction, I understand the red flag that
3  the Court is talking about, the fact that this
4  individual did not have counsel in light of his prior
5  record and the fact that the burden under the Bradshaw,
6  Custis test shifts to the defendant to establish that
7  there has been a constitutional violation. I would
8  submit that the defense has not sustained that burden,
9  but I'll tender the law to Mr. Andresen, and quite
10 frankly, Judge, I'm not sure if it makes any difference
11 in this case.

12    THE COURT: Well, I don't think -- it may not.
13 At this point, it will not make any difference. At a
14 later point, it may make some difference.

15    MS. SHAPPERT: That is true.

16    THE COURT: But what I want to know now is --
17 I've already found that these are appropriate type
18 sentences to be considered and that it does put him into
19 the career offender category, but I am questioning now
20 whether after having made that finding, are those such
21 that the Court ought to consider it again and make some
22 determination of whether the offense is that type of
23 offense that should, in fact, make a person a career
24 offender.

25    MS. SHAPPERT: Your Honor, the Fourth Circuit has

1    held that assault on a female is that kind of offense.

2         THE COURT:  I understand they have found that.

3         MS. SHAPPERT:  And I would submit in this case

4    that that would be appropriate.  The only information we

5    have from the presentence report is by striking her with

6    his fists, and that clearly is a serious assault or I

7    would submit could well be.  Again, I would reiterate

8    that presumption is regularity, this is a collateral

9    attack, the Federal Courts have said, we don't want to

10   relitigate state cases.

11        THE COURT:  I can't do that.

12        MS. SHAPPERT:  Absent a showing that there is a

13   constitutional violation that we should accept on face

14   value the state conviction.  I would note Mr. Andresen

15   did seek to have it set aside.  It was not set aside by

16   the state system.  In light of that -- and I realize he

17   has a right to appeal that.  In light of the fact that

18   has not happened, this court should accept the

19   conviction on its face value.

20        THE COURT:  Well, Mr. Andresen, I have found that

21   they are properly to be included as proper offenses for

22   the enhancement.  I will be glad to hear you at a proper

23   time.

24        Now, is there any other thing that you wish to be

25   heard on in the way of objection?

1      MR. ANDRESEN: Let me have just a second, Judge.
2   We would withdraw the last one, Number 11 in our
3   objections, that goes to a 5C1.1 matter. That can be
4   withdrawn. No, nothing else, Judge, with respect to
5   objections.

6      THE COURT: All right. The Court has made its
7   findings, and subject to the findings that have been
8   made by the Court today, which may and have changed some
9   of the provisions of the presentence report, the Court
10  adopts for purposes of sentencing the presentence report
11  prepared by Ms. Easley for Mr. Dean and for Mr. Sampson
12  subject to the changes that have been made and put on
13  the record here today.

14      Now, with that in mind, Mr. Andresen, that puts
15  your client in the same category of a count -- actually,
16  it's a count 45, but it's a count 43 offense level
17  because that's the highest that it goes. Your client is
18  in the criminal history category of 6 where life
19  imprisonment is mandatory, ten years of supervised
20  release, 8 million dollars of fine and a $50 special
21  assessment. Do you agree that that is the area that we
22  have calculated offense level?

23      MR. ANDRESEN: Yes, sir.

24      THE COURT: All right, sir. Now, if you will
25  have a seat, Mrs. Rausher, do you have any objection to

```
 1    the Court adopting the presentence report as I have just
 2    said subject to the changes that I have made here today
 3    and subject to your objections to what I found, too, of
 4    course?
 5            MS. RAUSHER:  No, Your Honor.
 6            THE COURT:  Do you have any evidence that you
 7    wish to present on an appropriate sentence in the case?
 8            MS. RAUSHER:  Yes, Your Honor.  Your Honor, in my
 9    memorandum, I purport to the Court two grounds for
10    downward departure in this case.  As the Court is aware,
11    since we weren't exactly sure where the guideline ranges
12    would be coming out, it was hard to, in fact, fashion
13    the argument.
14            THE COURT:  I understand.
15            MS. RAUSHER:  But I certainly can make the
16    argument now.  My first argument, Your Honor, is
17    regarding the extraordinary disparity in sentencing
18    between -- that Mr. Dean is exposed to as opposed to
19    other codefendants.  And I am aware of United States
20    versus Ellis and United States versus Hall and I've read
21    those cases, but I think it's important that this issue
22    be preserved in light of the evidence in this case.
23            And so I thought it was important for the Court
24    to see what the sentences were of the codefendants, and
25    especially in light of the testimony which Your Honor
```

1    has heard about Marcus Massey and Mack Hopper, the kind

2    of individuals they are, the violent nature of their

3    reputations. This is from witnesses who were family

4    members, associates, and some people who didn't even

5    know, I mean, if you recall Damon Reagan testifying that

6    he didn't know Marcus Massey very well but he did know

7    his extraordinary reputation for violence, and he, Your

8    Honor, has been sentenced to a term of imprisonment of

9    15 years, and certainty at some point, and who knows, it

10    may even be reduced further, I certainly hope not. But

11    I think that it's important in this case, based on the

12    testimony and the kind of --

13    THE COURT: Let me stop you right there if I

14    may. Was he sentenced after this trial?

15    MS. SHAPPERT: Yes, sir, he was.

16    MS. RAUSHER: He was sentenced in December, Your

17    Honor.

18    THE COURT: Thank you, go ahead.

19    MS. RAUSHER: And so in light of all the

20    information, and that includes all the testimony that

21    came out in trial, the impeachment, the photographs

22    showing him carrying semiautomatic weapons at Boulevard

23    Homes and all the different information, and

24    including -- I've also had the opportunity through

25    investigation in another case that I'm counsel of to see

1    the files of a whole other drug investigation, and low

2    and behold, I saw Marcus Massey's name mentioned

3    throughout the file in that case.  And I never saw

4    Cedric Dean's name mentioned in the file of the case,

5    but I saw Marcus Massey involved in drug dealing in

6    other areas of the city.  And it's extraordinary that

7    someone like him can get a sentence of 15 years.

8              So I think in this case, Your Honor, it's

9    appropriate that the Court take that into

10   consideration.  That's my argument, Your Honor.

11             THE COURT:  Thank you, Ms. Rausher.

12   Mr. Andresen, do you have any evidence that you wish to

13   present on behalf of your client?

14             MR. ANDRESEN:  No evidence, Judge.  I wish to be

15   heard.

16             THE COURT:  Be glad to hear you.

17             MR. ANDRESEN:  May it please the Court, the

18   guidelines, of course, have restricted the Court's

19   discretion a great deal quite clearly, and the Court

20   well knows that.  I don't believe, however, that they

21   were meant to so bind the Court's hands that in the

22   appropriate case, the Court would be precluded from

23   fashioning a sentence that was appropriate.

24             Title 18 U.S. Code, Section 3553(b) speaks

25   specifically, I submit, to you to that point in this

```
1    case where it says that the Court shall impose a
2    sentence of a kind and within the range referred to in
3    the guidelines unless the Court finds that there exists
4    an aggravating or mitigating circumstance of a kind or
5    to a degree not adequately taken into consideration by
6    the Sentencing Commission in formulating the guidelines
7    that should result in a sentence different from that
8    prescribed.
9              And it says in determining whether a circumstance
10   is adequately taken into consideration, the Court shall
11   consider only the sentencing guidelines, policy
12   statements, official commentary of the Sentencing
13   Commission, and nowhere in there does any of that stuff
14   as it relates to the guidelines, I submit to you, deal
15   with a case like we have today where literally these
16   two, my client in particular, is facing a life sentence
17   so disproportionate to what else has happened with
18   respect to other main players solely because he
19   exercised his right to go to trial and put the
20   government to its test. It's the only reason.
21             THE COURT: Mr. Andresen, that's not quite
22   correct. If that were, I would be even more upset than
23   I am. But there is an additional part of that, too, as
24   you well know. Not only did the other people not
25   exercise their right of going to trial, but they
```

1    testified.

2         MR. ANDRESEN: They did testify.

3         THE COURT: And the 5K1.1 is an area where the
4    disparity now appears.

5         MR. ANDRESEN: Yes, sir, they did testify. And
6    as we have been suggesting throughout the course of this
7    hearing, you know, that there is testimony and there is
8    testimony.

9         THE COURT: Yes, sir.

10        MR. ANDRESEN: And this testimony simply doesn't
11   have the quality, the ring to it that scores of other
12   criminal prosecutions have had. We have had people on
13   the stand in this case who have said, and admitted to
14   saying one thing in front of an agent at one time,
15   saying something different on the stand, something
16   different from what a codefendant would testify to,
17   something different from what the agent himself says was
18   said by that particular witness. It has been all over
19   the place, and we submit to you fashioned for the
20   purpose of achieving what they have achieved, and that
21   is very light sentences as it relates to what these
22   clients now face.

23        Now -- and I realize this is tough and it's a
24   difficult thing for the Court to do, but the phrases
25   such as sentencing manipulation and disparate sentencing

1   don't -- are not hollow, they have to have some meaning,

2   and I realize the courts have been difficult -- have set

3   up a difficult standard with respect to that.  But in

4   this case, this sentence, we submit to you, given the

5   context of the entire conspiracy and all of the

6   situations and circumstances of which the Court is

7   aware, the appropriate sentence in this case for my

8   client, I submit, is not life, that he is overstated in

9   the first instance as a career offender, although I

10  recognize that at a 45 level, I guess it would be two,

11  he would still be a mandatory life sentence so that for

12  purposes of arguing whether the career offender status

13  applies or not, I would be wasting the Court's time with

14  these calculations.

15       But in the context of where this man ought to fit

16  in, I submit to you that 18.3553(b) does give the Court

17  in this particular case the opportunity to depart

18  downward to fit an appropriate sentence for him, and

19  whether that is something more than 15 years or less

20  than 15 years, it would be up to the Court, in the

21  Court's discretion.

22       But clearly, even given the appropriate measure

23  for cooperation that Massey received, recognizing he did

24  testify, and even if you said, well, he testified, but

25  I'm going to discount 50 percent of what he said because

1    that's just the way he is, he's been called a deceiver
2    by many, a liar by some and I'm just going to credit
3    only part of what he says and I'll give him credit for
4    testifying, and if he got his 15 years, fine. Somehow
5    that means something in this case to Eric Sampson.
6    Otherwise, I submit to you that the idea that Massey can
7    walk in and walk away with a 15-year sentence and this
8    fellow is going to face a mandatory sentence of life,
9    there is no meaning in the sense of proportionality in
10   sentencing. So I ask you to consider that, Your Honor,
11   when rendering a sentence in this case.

12          THE COURT: Thank you, Mr. Andresen.

13          MS. RAUSHER: Your Honor, I think it's important
14   that the Court know some of the people who are here on
15   behalf of Mr. Dean.

16          THE COURT: Yes, I do want you to know also,
17   Ms. Rausher, that I have read each letter and each
18   document that has been submitted, the letter from the
19   mother, the grandmother, the employer, the minister, the
20   people who are friends and the letters of
21   accomplishment, high school education, the cooking
22   school, the various other things that your client has
23   done, I've looked and read each one of them. You may
24   proceed.

25          MS. RAUSHER: Your Honor, present today in

1   Mr. Dean's behalf is Ms. Locklear, his sister, if you

2   could stand, please, Reverend Paul Drummond from

3   St. Paul's Baptist Church was here this morning, he

4   could not stay, Lincoln Frasier, his grandfather, would

5   you stand up, Mr. Frasier, Gloria Ingram, his aunt,

6   Ronald Dean, his uncle, Priscilla Hood, his aunt, Faye

7   Frasier, his grandmother, The Reverend James McKissock,

8   from New Hope Baptist Church, his mother, Betty Dean, of

9   course, is here, and Pastor John Phelps, the chaplain

10  from the jail, and he would like to address the Court,

11  Your Honor.

12      THE COURT:  All right, everybody may have a seat

13  with the thanks of Mr. Dean and Ms. Rausher and the

14  Court that you have come here today.  I'll be glad to

15  hear what you have to say, sir.  You may stand right

16  there if you like.

17      UNIDENTIFIED SPEAKER:  Thank you for hearing me,

18  Your Honor.

19      MS. RAUSHER:  Would you state your name for the

20  record?

21      UNIDENTIFIED SPEAKER:  My name is Chaplain

22  John A. Phelps.  I am with Calvary Chapel in Cornelius,

23  and I have a full-time voluntary ministry in the

24  Mecklenburg County Jail North.  I go there Monday

25  through Friday each week, do counseling, Bible study,

1    and I'm also active in doing a basic life skills course

2    to help inmates, both male and females, when they get

3    out to be able to relate better to society.

4        I met Cedric Dean in September of last year when

5    he came to the basic life skills course, which he

6    attended for eight weeks, and I have got to know him

7    also in counseling and also in his assisting in Bible

8    studies bringing other young men to couple down to hear

9    the word of the Lord, and also he's been a big

10   encouragement in that ministry.

11       I have never been before a court before in this

12   way, and I just feel very highly about this young man

13   that he has a desire to change his life.  It's my

14   understanding that he's really been incarcerated since

15   he was 16 years of age, and any consideration you can

16   consider of that factor.  He was very young when he

17   first became involved in problems.  I see a real growth

18   in him in his directions now and would ask you to take

19   that into consideration.

20       THE COURT:  Is it Reverend Phelps?

21       UNIDENTIFIED SPEAKER:  Yes, sir.

22       THE COURT:  Well, there are two things that I

23   want to respond to you on.  One is that I can't imagine

24   a greater undertaking by anyone than to volunteer in the

25   prison ministry here in Mecklenburg or anywhere else in

1   the state.  Certainly, I can't imagine a greater need

2   anywhere than to have one who is associated with the

3   desires and hopes that you have that would share those

4   with people who are in need, some of whom may be wrongly

5   imprisoned, some of whom may be properly imprisoned and

6   some of whom may be hard as nails and other of whom may

7   be the finest people who ever lived, who face difficulty

8   and are trying to live with that.

9       But I do want you to know, sir, that I can't

10  imagine, I can't think of anybody in Mecklenburg County

11  or Guilford County, where I live, who is contributing

12  more toward helping mankind than people who will

13  volunteer full-time services in the ministry that you're

14  doing, and I thank you for that and I thank you for

15  being here today.

16      Secondly, I certainly use no excuses because I

17  don't have to be here, I could do other things so I'm

18  not hiding behind any excuses, but there are many

19  dilemmas that are facing the courts these days, the

20  individual courts, because of the type of system that we

21  now have when it comes to deciding what type of

22  sentences to give, and I'm not using that as an excuse

23  at all.

24      I must also tell you that it's encouraging to

25  know that Mr. Dean has been responding well.  It is

1   true, though, that from what I heard in this case, there
2   were some very bad things going on that were being
3   perpetrated by the group of people, including Mr. Dean
4   and Mr. Sampson. And so I don't know personally what
5   the is best that could possibly be done to help Mr. Dean
6   improve his life, but I do know that what you have done
7   is probably a bigger factor than anything I could ever
8   do or anybody else would ever do. So I thank you for
9   what you have done, I thank you for your perspective,
10  but I hope you will understand that the Court must do
11  what it feels it is required to do also in the hopes
12  always that people will reform, in the hopes that people
13  will understand and will turn to things which you
14  espouse to help make it a better life. I thank you,
15  Reverend Phelps, for your contribution.
16      UNIDENTIFIED SPEAKER: May I add one more thing,
17  sir?
18      THE COURT: Yes, sir.
19      UNIDENTIFIED SPEAKER: I do have an additional
20  ministry called Set Free Ministry supported by my
21  church, and this year I have been able to help three
22  young men to become reestablished with jobs and homes
23  and would extend that to Cedric Dean.
24      THE COURT: Well, thank you very much for that.
25  Are you associated with the Episcopal church?

1    UNIDENTIFIED SPEAKER:  It's -- we are

2  nondenominational, Your Honor.

3    THE COURT:  Nondenominational?

4    UNIDENTIFIED SPEAKER:  Yes, Your Honor.

5    THE COURT:  All right.  Thank you, sir, thank you

6  very much.  Thank you, Ms. Rauscher.

7    MS. RAUSHER:  Your Honor, Cedric Dean's mother

8  would like to address the Court.  Ms. Baker?

9    THE COURT:  You may stand right there if you

10  like, is it Ms. Baker?

11    MS. SPEAKER:  Yes.  I would like to say -- I

12  would like to plead mercy for my son, which is my only

13  child that I do have, and I'd just like to be a little

14  character witness for him.  I would like to say that

15  Cedric went everywhere I went until he was 14 years

16  old.  He grew up in the church.  I'm not saying nothing

17  that -- nobody told me what I know, I took him Sunday

18  after Sunday.  He started messing up when he was about

19  14 years old and when he started messing with Marcus

20  Massey at 14 years old.

21    He only had two years out when he got this

22  robbery offense against him when he was 16 years old.

23  He was in five and a half years, which he was immature,

24  five and a half years.  He really hadn't had a chance.

25  When he got out, it was two weeks, I got him a job at

1    Bojangle's working.  He was with his church friends.  At

2    that time, Mr. Massey was incarcerated downtown.

3    That -- Marcus Massey is his downfall.  This is what all

4    this comes from, this is his downfall.

5         When he got out, he was working, and three months

6    I helped him get a car.  And when Marcus -- every time

7    Marcus would call, this is when things would happen.

8    And the January 20th incident at Kentucky Fried Chicken,

9    my son was working at the Radisson Plaza downtown and he

10   was over at my sister house that day and that's where

11   Marcus Massey called him.  That's his downfall.

12        I just ask you to please have mercy on him, give

13   him another chase because Marcus Massey is getting

14   another chance, because that was his downfall.  He did

15   not -- like I say, he worked and he did what he could,

16   but, you know, we all falls, we all makes mistakes.  He

17   is not a career offender.  I just ask you to please give

18   him another chance.  Don't throw him away and throw away

19   the key because he don't deserve it, he really don't

20   deserve it. I know he's done bad things.  I ask you to

21   have mercy on him.  Give him another chance like the

22   other two boys got a chance.  He don't deserve it, he

23   really don't.

24        THE COURT:  Ms. Baker, I can't imagine anybody

25   who is in a worse position than you must be as the

128

```
1    mother, so whatever the case you may, whatever has been
2    said and done has been articulately said, and I am sure
3    you will continue to try. And I think this is a bad
4    day, and if the attorneys think this is a bad day and
5    the defendants think this is a bad day, you must in your
6    position as the mother think this is an even worse day
7    than any of us have a right to feel. So I thank you for
8    being here, and I thank you for supporting your son.
9    Thank you.
10         MS. RAUSHER: That's it, Your Honor.
11         THE COURT: Ms. Shappert?
12         MS. SHAPPERT: No, Your Honor, I have nothing to
13   say.
14         THE COURT: Mr. Dean, you are not required to say
15   anything at this point, and if you don't say anything,
16   it will not be held against you. But this is a serious
17   matter to you, a matter which Mrs. Rausher has done an
18   extremely good job, particularly once you allowed her to
19   take over and represent you in this case. I must
20   continue to say that I think that was a big mistake on
21   your part not to do that earlier, but that was your
22   decision and you shall certainly not be punished by
23   that, but that was a big mistake.
24         Nevertheless, there may be something that you
25   want to bring to my attention, and if there is, I will
```

1     be glad to hear from you as to anything that might

2     affect your sentence in this case other than what

3     Ms. Rausher has ably done and said for you so far.

4     DEFENDANT DEAN: Well, Your Honor, I have thought

5     about exactly what I wanted to say and I decided that

6     the best thing that I could say would be the right thing

7     to say and the worse thing would be just to say nothing

8     at all. And I've been told in my life that if a man

9     stands for nothing, he would fall for anything. And

10     today, I stand before you standing for what this country

11     stands for, justice, truth and equality. And first, I

12     want to talk about justice.

13     Justice is the primary reason for us being here

14     today, and today, society is seeking justice against

15     myself to heal the wounds that have been caused through

16     drug dealing in the streets. Now, when you seek for

17     justice, you must seek for justice through truth, and

18     the truth is I have done wrong in my life, and the

19     people --

20     THE COURT: I'm sorry, you have no what?

21     DEFENDANT DEAN: I have done wrong in my life,

22     sir, and people who does wrong should be punished and

23     must be punished but through truth and through

24     equality. And only God knows, as well as the members

25     involved in this alleged conspiracy, what the truth is.

1    And I'm not going to argue my innocence because this is

2    not the appropriate time.  However, I will say that in

3    order for justice to be served today, truth and equality

4    cannot be left out.  And justice is something you cannot

5    take into your own hands, and it is unlawful to take

6    justice into your own hands.

7        But one servant of the public told me on

8    September 15th, 1995 that if I didn't plead guilty, that

9    she would see to it personally that I get life in

10   prison, and today I see that promise being kept by

11   Ms. Shappert.  But if the evidence is not there to

12   support a life sentence, you cannot just put it there.

13   And one example, I feel, in response to Ms. Shappert's

14   objections, in her response to my objection of the

15   presentence report, number 7, she made what she called a

16   conservative estimate of 12 ounces to be attributed to

17   myself through the testimony of Mr. Purvis Montez.

18       Now, it came out to be a fact that Mr. Montez

19   actually testified that he dealt with no more than one

20   ounce and a half during the year 1994.  Now, to me, I

21   feel that someone of the government, a servant to the

22   public, should not be making errors like that when you

23   dealing with a man's life.  And this is not a game.  The

24   ones that are going to reap from the decision that's

25   made today is me and my family.

```
1      You know, I just got to say this. See, I
2   honestly feel, you know, as I come in here today, I
3   don't see a seriousness in here, you know. And with all
4   due respect to Your Honor, it appeared that in a way --
5   you say you read the transcripts this morning, you know,
6   you had your notes, and that was good. But, you know,
7   what really caught my attention, you know, was simply
8   the mistake that was made about the people that was
9   working for me with Eric Sampson. I mean, when you're
10  dealing with a man facing a life sentence in prison with
11  no parole, everything should be done in decency and in
12  order. She shouldn't make no mistakes, she should have
13  people that's behind her to correct the mistakes that
14  she made. You can't take this thing personally. This
15  is a job, and I understand that she may have career
16  goals, but one thing about career goals, they must be
17  realistic, worthwhile and attainable.
18      THE COURT: Ma'am, just be quiet back there,
19  please, ma'am. You are welcome to listen, but please
20  just hold on tight.
21      Now, Mr. Dean, proceed. It's all right to have
22  career goals, but.
23      DEFENDANT DEAN: But they must be realistic,
24  worthwhile and attainable. Is it worth your while to
25  actually make up amounts just to get into the 1.5 -- in
```

1  excess of 1.5 kilograms because you are upset that this

2  man didn't cooperate, this man didn't take a plea

3  bargain?

4          And, Your Honor, the last thing I want to talk

5  about is equality. Now, this alleged conspiracy was to

6  have transpired from January of '92 to January of '95,

7  and it's no hidden secret, from August of 1988 until

8  February 12th of 1994, I was incarcerated during the

9  time that in 19 -- in 1992, in January of '92 when guys

10  was out there, supposed they had been getting together

11  and making a conspiracy, I was incarcerated. When I got

12  out, it was '94. Now, at the most, and involvement of

13  me could have been 11 months. The Court has documentary

14  as far as the jobs that I maintained as well as the

15  times that I had been incarcerated in jail.

16          And I just want to make one last note that the

17  reason -- see, as I heard my mama sit there and talk,

18  she spoke the truth, truth, and see, the truth is I made

19  my mistakes hanging with Marcus Massey. At 14 years

20  old, I made my mistake. I should have never got wrapped

21  up in dealing with this guy. But, you know, through the

22  testimony, you've seen Marcus's demeanor, you've seen

23  his character, and it's sad that a man such as Marcus

24  Massey can actually come in here and manipulate the

25  system like this and get 15 years and then here I am,

1    was only out approximately ten months as far as this

2    conspiracy is concerned, and fixing to get a life

3    sentence, life.

4         But the laws of this land is to be based on

5    justice, equality and truth. What's equal about Marcus

6    Massey with the character that was derived through the

7    trial testimony getting 15 years and putting me away for

8    life? Society is the one that's hurting, society is the

9    one that needs to be healed. See, here society is

10   excusing him by allowing Mr. Massey to reform, and he

11   still have the opportunity and the right to come back to

12   testify against somebody else and get his time cut down

13   lesser than that. And if he could testify against so

14   many people, he had a right to get out in no time, but

15   does that mean that Marcus Massey is reformed, does that

16   mean that he has changed? No, it just means that he has

17   been allowed to manipulate the system. However,

18   somebody such as myself get wrapped up in this

19   conspiracy, and, Your Honor, in all truth, in all

20   honesty, when I wasn't trying to be sarcastic, I wasn't

21   trying to be funny. What has happened, it had to

22   happen, and what's going to happen today, it can't be

23   stopped. And with all due respect to Ms. Shappert, to

24   the agents, to you and to my family and everybody, I'm

25   sorry that this burden has ever transpired and the time

1    that has been put into this, it should never have been

2    put into this. And I just want to say, Your Honor,

3    that --

4          THE COURT: What do you mean by that, the time

5    that's been put into this?

6          DEFENDANT DEAN: I'm talking about the time that

7    has been put into this by my family having to come down

8    here and see -- having to come down here and sit in

9    these hearings, like you say, it is boring to sit in

10   these hearings like this right here, it is boring, but

11   they're here because they care, they're in support.

12         You know, see, it's like this, Your Honor, you

13   know what's going on as far as how the system is set up

14   today. I believe from what I gathered from what you

15   said, you said they're trying to make some kind of

16   changes as far as how a person such as myself can be

17   sentenced to life in prison and then the leader,

18   supposed to be the originator, the person that say he

19   set up everything, the person that say he did all this

20   stuff says is Marcus Massey get off the hook with 15

21   years. I mean, when he go back into society, what's it

22   going to be then when he go and he may kill somebody or

23   he may shoot somebody?

24         He testified to shooting at people, but never

25   once, never once did you hear Cedric Dean shot at

1    anybody, Cedric Dean shot and killed anybody. But

2    today, it seems as if I'm going to be punished as if I

3    killed somebody, as if I -- I'm getting a life sentence,

4    just -- and I just let you for letting me say that. I'm

5    not going to take up no more of your time.

6         THE COURT: Thank you, Mr. Dean.

7         Mr. Sampson, you are not required to say

8    anything, and if you don't say anything, it will not be

9    held against you. However, this is a serious matter to

10    you, and if there's anything in addition to what

11    Mr. Andresen has ably done for you and on your behalf,

12    I'll be glad to hear what you have to say as it may

13    affect the sentence.

14         MR. ANDRESEN: May it please the Court, he does

15    want to address the Court briefly but asks if the Court

16    would hear from his sister, Jennifer Locklear, just

17    briefly.

18         THE COURT: Ms. Locklear, would you please come

19    up? Right there is fine, Mrs. Locklear, unless you'd be

20    more comfortable up on the stand, that's fine.

21         UNIDENTIFIED SPEAKER: No, Your Honor.

22         THE COURT: All right.

23         UNIDENTIFIED SPEAKER: I'm here on behalf of my

24    whole family. We just found out about this this

25    morning, about the hearing. So I'm here on behalf of --

1    my mom's here and my husband and one of my brother's

2    aunts are here, and I just want to say that we love Eric

3    very much and --

4         (Pause.)

5         THE COURT:  Ms. Shappert, hand her some water,

6    please.

7         MS. SHAPPERT:  Certainly.

8         THE COURT:  Just take your time now.  There's

9    nothing to be embarrassed about or feel badly about in

10   taking your time either, you just take your time.

11        (Pause.)

12        THE COURT:  Ms. Locklear, let me see if I can,

13   when you're ready, start a different way by first asking

14   you to point out your husband and your mother, where

15   they're seated, because I don't recognize them from

16   where I am.  Would you point out who's here?

17        UNIDENTIFIED SPEAKER:  There's his mother, and

18   William Locklear (indicating).

19        THE COURT:  Mr. Locklear.  And that's

20   Mr. Sampson's mother.  Thank you, Mrs. Sampson.

21        UNIDENTIFIED SPEAKER:  I'm his aunt, Willie Mae

22   Sampson.

23        THE COURT:  I'm sorry?

24        UNIDENTIFIED SPEAKER:  I'm his aunt, Willie Mae

25   Sampson.

1    THE COURT: You're his aunt?

2    UNIDENTIFIED SPEAKER: Yes, sir.

3    THE COURT: Thank you for being here.

4    UNIDENTIFIED SPEAKER: Okay. Eric really just

5    started getting into a lot of trouble, I guess, in high

6    school. He really didn't grow up with a father -- we

7    grew up with a father, he passed away about two years

8    ago and we're less of a family, me and my mom, she's a

9    single parent, and my brother. In high school, we broke

10   away from each other. My mom and my brother stayed

11   together, and me, I went to high school somewhere else

12   so I stayed with one of my other aunts. And so we were

13   broken up coming up through high school, so me and Eric

14   really just lost a lot of touch with each other and he

15   got in with the wrong crowd and, you know, started

16   getting into a lot of trouble like that. And that's

17   how like everything started.

18       We -- when my father died, we found out that we

19   had like eight other brothers and sisters and all of us

20   really connected. We have brothers and sisters in New

21   York, and Eric did go visit them in January and really

22   got close to them. They were here this weekend for a

23   funeral of my grandmother's, and they would have been

24   here today but we really didn't know what was going on

25   today, we just found out.

1        But I just want to say that we're in support with

2    him, and he's changed drastically. He's working on his

3    G.E.D. while he's incarcerated. And I feel that he's

4    been punished for what he's done, but I don't feel like

5    a life sentence that he faces is the punishment for him.

6    He has a five-year-old son, and I just hate to see his

7    son grow up like he did without a father, and a wife.

8    So I just ask that the Court have mercy on him as far as

9    letting him be with his son and his family.

10       THE COURT:  Ms. Locklear, I thank you for being

11   here and I know that's difficult to say, but thank you

12   for doing that.  Do you work outside?

13       UNIDENTIFIED SPEAKER:  Yes.

14       THE COURT:  What do you do?

15       UNIDENTIFIED SPEAKER:  I'm a secretary with J.A.

16   Jones.

17       THE COURT:  And did you know about the trial in

18   this case?  You may have been here for the trial.

19       UNIDENTIFIED SPEAKER:  I was at the trial, but --

20       THE COURT:  You were at the trial.

21       UNIDENTIFIED SPEAKER:  I was out today because

22   some -- of the funeral yesterday, and we got a call this

23   morning from Eric's wife saying that we had sentencing

24   today.

25       THE COURT:  Okay.  Well, I thank you for being

1    here today.

2         UNIDENTIFIED SPEAKER: Thank you.

3         THE COURT: Thank you, Ms. Locklear.

4         Mr. Sampson?

5         DEFENDANT SAMPSON: Yes, Your Honor. I don't

6    have too much to say, but I think that, you know, a

7    harsh sentence in my situation would do more harm than

8    good. You know, like my sister just said, I have a

9    family, a wife and son, plus my family has suffered

10   greatly, I've suffered greatly. You know, I'm not

11   dwelling on being a career offender or nothing like that

12   because I know it's already been done. But, you know,

13   this is really my first time in trouble as far as being

14   incarcerated, I've never been incarcerated, so, you

15   know, it's something new for me. And as far as being

16   rehabilitated, I feel like that I have been

17   rehabilitated as far as trying to further my education

18   and going through career programs and just on and on.

19   And --

20        THE COURT: What was it that -- if you did,

21   Mr. Sampson, what was it that made you decide to run

22   with the people that you decided to run with?

23        DEFENDANT SAMPSON: Well, like I said, just -- I

24   guess the Court will have to consider whether it's a

25   fabrication or whatnot, but some of the guys, Marcus

1    Massey, you know, I've been knowing them from the

2    neighborhood since we was little, we went through school

3    together. And as far as, you know, I still plead my

4    innocence in that, but --

5         THE COURT: Well, I understand that, I'm not

6    talking about that at all. But everybody seems to admit,

7    the family, the probation report and I don't think

8    anybody here has yet denied that there came a time in

9    your life when you sort of began to run around with a

10   bad crowd.

11        DEFENDANT SAMPSON: Right. Well, the crowd that

12   I started to run around with at first was like guys in

13   high school, it wasn't the guys that we're talking about

14   now, but it was like guys in high school as far as they

15   was getting caught up in things and I'd be with them.

16   And as far as taking things, you know, like possession

17   and smoking marijuana, things --

18        THE COURT: So why did you decide to do that?

19        DEFENDANT SAMPSON: To do what I was doing?

20        THE COURT: Uh-huh.

21        DEFENDANT SAMPSON: I guess just trying to be in

22   with the crowd at that time. I was 17, 18 years old.

23        THE COURT: When did you get into drugs?

24        DEFENDANT SAMPSON: Around when I was 17 or 18.

25        THE COURT: Did the drugs come from benefit of

1   things you stole, or did the things you stole come from

2   the results of the drugs?

3         DEFENDANT SAMPSON: Things that we stole, it

4   didn't come from the result of anything, it was just

5   something that young guys do, run around and do, steal

6   radios and --

7         THE COURT: Well, I don't know that young guys

8   just steal radios. I dare say there are people out

9   there who are not stealing radios, and I'm just

10   interested in why you thought it was necessary to steal

11   them.

12         DEFENDANT SAMPSON: Like I said, Your Honor, I

13   wasn't stealing the radios, I was with the people who

14   were stealing the radios --

15         THE COURT: Well --

16         DEFENDANT SAMPSON: -- and I just got caught up

17   hanging around them because I liked to be around those

18   type of people.

19         THE COURT: Why?

20         DEFENDANT SAMPSON: Just being in with the in

21   crowd.

22         THE COURT: What is it that makes them the in

23   crowd?

24         DEFENDANT SAMPSON: Because it seemed like, you

25   know, everyone that at the school where I was hanging

1  around at the time or just being associated with, that's

2  what they were -- that's what they were in, and I just

3  didn't --

4        THE COURT:  All right, anything else,

5  Mr. Sampson?  I interrupted you, I think.

6        DEFENDANT SAMPSON:  As far as, you know, my

7  representation, you know, I'm not going to downgrade

8  Mr. Andresen or nothing like that because I feel like he

9  did the best he could within the time frame that he had.

10  But, you know, I just feel like I didn't get the legally

11  proper representation because we never filed pretrial

12  motions, you know, so he could actually represent me

13  at trial.  We never, you know, went over things to

14  prepare for trial like we should have prepared for

15  trial.  And --

16        THE COURT:  What was there that you wanted to

17  bring out that you didn't bring out?

18        DEFENDANT SAMPSON:  That I wanted to bring out?

19        THE COURT:  Yes.

20        DEFENDANT SAMPSON:  As far as some of the

21  evidence --

22        THE COURT:  Yeah, or whatever you thought was

23  important.

24        DEFENDANT SAMPSON:  Like some of the evidence

25  that was used, I think, you know, that we should have

1    had things like suppression hearings and things of that

2    nature to see if the government was going to use the

3    evidence that they used.

4         THE COURT:  I'm just not aware of what

5    suppression --

6         DEFENDANT SAMPSON:  Like the drugs and the guns

7    and the drugs which he just filed a motion on.

8         THE COURT:  Well, Mr. Andresen fought to keep

9    those out, so you -- he fought the entry of those guns,

10   both before and after they were introduced.

11        DEFENDANT SAMPSON:  I'd just like to say, Your

12   Honor, you know, as far as, you know, like everyone else

13   on the indictment, you know, they were given a second

14   chance and they've been implicated in more criminal

15   activity than, you know, me and some of the other people

16   in this indictment.  And --

17        THE COURT:  Well, two of them have, I'm not sure

18   about the other two, but two of them have.

19        DEFENDANT SAMPSON:  I just feel like, you know,

20   the breaks that they're getting, you know, for this

21   being my first time ever being incarcerated, you know, I

22   just feel like I deserve a second chance. I think every

23   time someone gets in trouble for the first time, they

24   shouldn't just be put away, they deserve a second

25   chance.

1        THE COURT:  So everybody should be given one free

2    bite?

3        DEFENDANT SAMPSON:   Everybody deserves a second

4    chance.

5        THE COURT:  All right, sir, anything else?

6        DEFENDANT SAMPSON:  No, sir, I'm done.

7        THE COURT:  All right, thank you, Mr. Sampson.

8        Ma'am, are you wanting to say something?

9        UNIDENTIFIED SPEAKER:  Yes, I would.

10        THE COURT:  You may, as long as it's all right

11    with Mr. Andresen and Mr. Sampson.

12        MR. ANDRESEN:  Certainly.

13        THE COURT:  You're an aunt?

14        UNIDENTIFIED SPEAKER:  My name is Willie Mae

15    Sampson.

16        THE COURT:  Beg your pardon?

17        UNIDENTIFIED SPEAKER:  My name is Willie Mae

18    Sampson.

19        THE COURT:  Willie Mae Sampson, would you come up

20    a little closer, please, Ms. Sampson?

21        UNIDENTIFIED SPEAKER:  Yes, sir.

22        THE COURT:  Right there is fine.

23        UNIDENTIFIED SPEAKER:  Thank you.  Your Honor and

24    the Court, I really don't know what I want to say, but I

25    do wish to ask also for mercy for my nephew, for Eric.

1   I heard you ask him how did he caught up with the crowd.
2   I do know, having been around young black men in similar
3   circumstances as Eric's, that sometimes there are things
4   that are missing in their home life or there's a certain
5   pressure in certain neighborhoods for them to fit in or
6   it could be very dangerous for them.  And being in a
7   contained neighborhood, when I say contained
8   neighborhood, it's like, you know, a housing
9   development, your boundaries are within those housing
10  developments, and so you pick and choose friends from
11  people there.

12       Sometimes just having come up in a housing
13  development, it promotes a stigma towards certain
14  people, young people.  I know because I've had to go
15  through it with other members of my family.  And it's
16  kind of like when you go outside of those boundaries,
17  you're not -- you don't carry as much worth as some
18  people do, and so you try to find people within your
19  boundaries who see a worth in you.  And I have never had
20  personal experience with it, so I'm just going on
21  suppositions that at some point, you will have to -- in
22  order -- you have a limited amount of friends that you
23  will have to try to fit in with them, and a young man
24  and some young ladies can be drawn into those
25  associations that are not beneficial to them.

1          I've seen a lot of young people in those

2     circumstances feel there is no hope for them outside of

3     those boundaries because at large, it's almost like when

4     the Lord Jesus was going through his own country, they

5     said there's nothing good you can expect to come from a

6     man who came from this country.  And it's almost like

7     that stigma is placed there, well, you don't expect

8     anything good to come from those who have come from that

9     area, and the moment something goes wrong, they'll say,

10    well, I told you so.  And so it's almost like you don't

11    really have a lot of hope.

12         There's not too many who can excel, nobody really

13    pays them a lot of attention because they don't expect

14    anything more.  And a lot of these people start flying

15    by the seat of their pants, they get into situations

16    where they're misdirected.  And I do believe, knowing

17    the background of my nephew, he has gotten caught up in

18    something and I do know that Eric was looking for

19    acceptance somewhere because he was not getting a lot of

20    the things he needed from home or from his neighborhood,

21    and so it's just escalated to a point to where he's here

22    now.

23         And since -- it's been times that he just stands

24    still and reflects and have us talk to him and have

25    tried to give him a new direction for his life and have

1    all the confidence in the world that there will be a new
2    direction for his life, and let him know that through
3    self-worth, that he has a family to nurture, a son to
4    bring up, a child to let know that, don't follow this
5    path because here I am, and from this time on, I want to
6    be for him and try to gather in some of the things that
7    life can offer to me. I've grown, I'm thinking this is
8    what he's thinking in talking with him, he's grown, he's
9    matured. Those things that were done were done from a
10   childish mind, a mind that had not been molded nor given
11   any direction, nor given any hope. And maybe this is
12   the harshest experience he could go through that could
13   bring him around to this, because now he has those
14   around him who love him, who will support him.

15       .And even those who would tell him he didn't have
16   that support, he can see now he has that support, he has
17   that love and he has those who are standing by him to
18   help him every step of the way as he crawls and then
19   stands and then walks to be the man I know he can be. I
20   thank you for your indulgence.

21       THE COURT: Thank you, Ms. Sampson.

22       Well, counsel for each of the two defendants, I
23   thank you for doing the job that you have done today.
24   Counsel for the government, I thank you for the job that
25   you've done. You each come from a perspective that I

1   think we should all, observers on the sidelines,

2   understand that you do your job as you think you should

3   do it, and you have ably represented the government and

4   each of you have ably represented your clients. And for

5   each of you who has appeared here on behalf of your

6   brother, your son, nephew or whoever it may be, you're

7   entitled to thanks from this Court, too.

8          What Mrs. Sampson had to say may very well be

9   true, a lot of what she said is probably true, and I

10  think there's some hope to be taken in some of the

11  examples that we're seeing around. We're not going to

12  stop drugs in the court system the way we're going now.

13  We're going to punish those who get caught, but we're

14  not going to stop it. And so when you look here for

15  justice, you look necessarily at the range that the

16  Court must deal with, and our Congress has said that's

17  justice, and it may or may not be. You may disagree

18  with that and you may agree, but whatever your position

19  is, we're not going to stop the drug trafficking from

20  this bench or any other bench or that table or that

21  table, either one.

22          The only place that I see any hope of happening

23  occurred recently in Baltimore. Not too many years ago,

24  about three or four years ago, a group banded together

25  in the type of housing that Mrs. Sampson is talking

1    about and said, we're not going to have people dealing

2    drugs in this area anymore, it's out of here. And the

3    people believed in it and the people put it out of

4    there. And it wasn't because of the law enforcement, it

5    wasn't because of the judges or the probation officers

6    or anyone else, it was because those people finally

7    stood up and said, enough is too much, we're not going

8    to have it anymore.

9         So if there are any of you who live in areas that

10   are like that, I encourage you to look at the example

11   that's before you and what's happened in the City of

12   Baltimore in an area somewhat similar to the areas that

13   have been talked about here in this trial, and the

14   people themselves are the ones that are going to have to

15   pull us up. That's not going to be much help to

16   Mr. Dean or to Mr. Sampson at this point, but it's going

17   to be a help to the other Dean's and Sampson's who are

18   out there who are going to follow the same line of being

19   with the cool crowd, and before you know it, you're in

20   head over heels.

21        Now, you and I may not like it that the leader of

22   an organization who pulls everybody into the

23   organization and gets them to come with him, though I

24   don't think there were any people pulled in here against

25   their will, the leader who gets caught and then is

1  willing to talk is under our laws going to be given

2  consideration that others are not going to get. That's

3  the way it is, and we can't look at it from the

4  standpoint, or we can look at it but it's not going to

5  do much good to look at it to say, he was more involved

6  than I was and though I didn't tell what I knew about

7  the situation, he's getting less time and that's not

8  fair.

9      There is a signal that goes out, rightly or

10 wrongly, that if you are involved in drugs or any other

11 crime and you want to help yourself, the best thing to

12 do is to tell what you know. There's always a danger in

13 that. There's the danger that you may tell things you

14 don't know, because who can really question you on that?

15 There's a good side to that that also whoever is telling

16 it, if it's true, is helping to bring others out of the

17 system that are violating the law and they're going to

18 have to suffer the consequences. This is no time for

19 sermons and I did not mean to impose one on you, but I

20 thank you all for your attention here today.

21      Mr. Dean, would you please stand up, sir?

22      Mr. Dean, it is the judgment of this court that

23 Counts 1, 4 and 6 should be consolidated for purposes of

24 this sentencing. The Count 6, which was originally not

25 less than 15 years under the point system assessed by

1  the Court, is really a minimum of ten years, not 15

2  years, but that's the only change I make from what I

3  said a while ago.

4      It is the judgment of this court that on Counts

5  1, 4 and 6, consolidated for judgment, that you shall be

6  committed to the custody of the Bureau of Prisons for

7  life.  It is further ordered that upon Count 5 of this

8  charge for which you were found guilty, you shall be

9  committed to the custody of the Bureau of Prisons for a

10  period of five years, which said five years shall be

11  consecutive to that imposed in Counts 1, 4 and 6 of this

12  judgment.

13      On Counts 1 and 4, supervised release of ten

14  years is imposed, on Count 5, there is supervised

15  release of three years, and on Count 6, a supervised

16  release period of five years, all of which will run

17  concurrently with the -- with each other.

18      The Court has reviewed the imposition of a fine

19  within the guideline range and has determined that the

20  defendant has no means with which to pay a fine, and

21  therefore, the Court declines to impose a fine.

22      There is a special assessment of $50 on each of

23  four counts, for a total of $200, which is due and

24  payable immediately and shall be paid at such times and

25  in such amounts as the defendant through the Inmate

1   Financial Responsibility Act may have withdrawn from his
2   earnings while he is in prison.  If the defendant goes
3   on supervised release, then the $200, if it has not been
4   paid or any portion thereof has not been paid, it shall
5   be paid within 180 days of his release.

6   The conditions of supervised release are (1) that
7   the defendant shall abide by the usual terms of
8   supervised release as appear on the orders of this
9   court; (2) that he shall within -- how long is it you
10  need him to report, 72 hours in this district?

11  PROBATION OFFICER:  Yes, sir.

12  THE COURT:  72 hours of the release from the
13  Bureau of Prisons, he shall report to the probation
14  office in this district or the district to which he is
15  released.  Anything else, Ms. Easley, that needs to be
16  added to that judgment?

17  PROBATION OFFICER:  What about attorney fees?

18  THE COURT:  What's the customary practice in this
19  district?

20  PROBATION OFFICER:  Usually it's case by case.

21  THE COURT:  Case by case.  I will not address
22  attorneys' fees except to the extent of saying that the
23  defendant has no means with which to pay attorneys'
24  fees.  At such time as the defendant may be released
25  from imprisonment, it is doubtful that he will be able

```
1    to make any payment.  Therefore, the Court declines to
2    order the payment of attorneys' fee, reimbursement of
3    attorneys' fees in this case.
4            Anything else, Ms. Easley?
5            PROBATION OFFICER:  No, sir.
6            THE COURT:  Thank you, you may have a seat,
7    Mr. Dean.
8            Mr. Sampson, would you please stand?
9            Mr. Sampson, it is adjudged that you shall be
10   committed to the custody of the Bureau of Prisons for a
11   period of the rest of your natural life.  It is further
12   ordered that if you are released from imprisonment, that
13   you shall be on supervised release for a period of ten
14   years.
15           The Court has reviewed the imposition of a fine
16   within guideline range and has determined that the
17   defendant is unable to pay any fine and for that reason,
18   declines to impose a fine.
19           There is a special assessment of $50 which shall
20   be due and payable immediately.  If it is not paid now,
21   it shall be paid at such times and in such amounts as
22   the Bureau of Prisons may withhold from any earnings the
23   defendant makes through the Inmate Financial
24   Responsibility Act.  In the event that the defendant is
25   unable to make payment on the special assessment while
```

1    he is in prison, then he shall be -- shall make the

2    payment within 180 days of his release while he is on

3    supervised release.

4         During that ten years that he is on supervised

5    release, he shall abide by the standard provisions of

6    supervised release as appear on the orders of this

7    court; (2) that he shall within 72 hours of his release

8    from imprisonment report directly to the probation

9    office in the district to which he is released.

10        The Court has considered the imposition of

11   restitution or the payment of attorneys' fees and has

12   determined that the defendant has no means with which to

13   pay attorneys' fees, and for that reason, the Court

14   declines to order that payment of attorneys' fees shall

15   be made by Mr. Sampson.

16        MR. ANDRESEN:  Will the Court recommend

17   designation to a place close to his home?

18        THE COURT:  I will recommend that each of the

19   defendants if they wish be considered for areas close to

20   their home places.  I do not make that in the form of an

21   order because that's up to the Bureau of Prisons, but it

22   is recommended that if possible, that they be sentenced

23   to the place that their families and friends can visit

24   with them from time to time.

25        MR. ANDRESEN:   Thank you, Judge.

1           THE COURT:  Anything else, Ms. Easley?

2           PROBATION OFFICER:   No, sir.

3           THE COURT:  Mr. Dean and Mr. Sampson, would you

4      both stand now, please?

5           It is my duty to tell you at this time, Mr. Dean

6      and Mr. Sampson, that you have an absolute right to

7      appeal what took place during the jury trial and what

8      has taken place today.  If you are unable to pay an

9      attorney to represent you and each of you seems unable

10     to pay an attorney to represent you, then upon motion by

11     you, the Court will appoint someone to represent you.

12     You should listen to Mrs. Rauscher, Mr. Dean, and you

13     should listen to Mr. Andresen, Mr. Sampson, to hear what

14     their advice is on an appeal, but in the final analysis,

15     it's your decision as to what you want to do.  And if

16     you want to follow their advice, that's up to you.  If

17     you don't want to follow their advice, that's up to you,

18     too.  But if you decide that you want to appeal, you

19     must give that notice within ten days of the entry of

20     this judgment or you would lose your right to appeal.

21     Mr. Dean, do you understand what I've just said to you?

22          DEFENDANT DEAN:  Yes, sir.

23          THE COURT:  Thank you, sir.  And Mr. Sampson, do

24     you understand what I've just said?

25          DEFENDANT SAMPSON:  Yes, sir.

1           THE COURT:  Thank you very much.  Mrs. Rauscher,

2    is there anything else that we need to cover?

3           MS. RAUSHER:  No, Your Honor.

4           THE COURT:  Mr. Andresen, anything?

5           MR. ANDRESEN:  No, sir.

6           THE COURT:  Counsel, I thank you, the defense

7    counsel and the government's counsel.  Good luck to both

8    of you in the long, hard ordeal ahead.  I wish you luck.

9    Let's recess court.

10                      (Court in recess.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                          CERTIFICATE

5

6          I, SCOTT A. HUSEBY, Official Court Reporter and

7     Notary Public, do hereby certify that the foregoing 156

8     pages are a true, accurate, and complete transcript of

9     the proceedings and that the parties were present as

10    stated.

11          This 29th day of August, 1996.

12

13

14

15                          _____

16                          SCOTT A. HUSEBY
                            Official Court Reporter
17                          and Notary Public in and
                            for County of Mecklenburg
18                          State of North Carolina.

19    My commission expires August 20, 1999.

20

21

22

23

24

25